UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**JUDGE MORAN**

MAGISTRATE JUDGE SIDNEY I. SCHENKIER

UNITED STATES OF AMERICA )
 )
 ) No. **04CR0281**
 ) Violations: Title 18, United States Code
v. ) Section 1344(1) and 2, Title 26, United
 ) States Code, Sections 7202 and 7206(1)
 )
ROBERT B. CREAMER )

**FILED**

MAR 1 0 2004

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

*DOCKETED MAR 1 1 2004*

## COUNT ONE

The SPECIAL SEPTEMBER 2002 GRAND JURY charges:

At times material to this indictment:

1.    a.    Defendant ROBERT B. CREAMER was the Executive Director of Illinois Public Action Fund, ("IPAF"), which was also known as and conducted business under the names Illinois Public Action, Public Action, and Illinois Citizens Action Fund.

b.    IPAF was a self-described public interest organization incorporated as a not for profit entity in the State of Illinois and headquartered in Chicago, Illinois.

c.    As Executive Director, defendant CREAMER functioned as the chief operating officer of IPAF, responsible for its day to day operations. In that capacity, defendant CREAMER, both directly, and through the actions of subordinates he directed, was responsible for maintaining the books and records, including depositing all corporate receipts in the corporate bank accounts and for signing and filing the tax returns filed on behalf of IPAF.

2.    a..    Defendant CREAMER was President of Citizens Action Center for Consumer Rights ("CACCR").

b.    Individual A was the registered agent and a corporate officer of CACCR.

c.    CACCR was a not for profit corporation registered in the State of Illinois and

headquartered in Chicago, Illinois.

        d.     As President, defendant CREAMER functioned as the chief operating officer of CACCR responsible for, among other things, its day to day financial operations. In that capacity, defendant CREAMER, both directly, and through the actions of subordinates he directed, was responsible for maintaining the books, records, and finances of CACCR, including depositing all corporate receipts into and executing transactions on the corporate bank accounts, and for signing the tax returns filed on behalf of CACCR.

      3.     a.     Cole Taylor Bank, ("Cole Taylor") located in Chicago, Illinois, and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        b.     IPAF held and maintained business checking account # 069092400 at Cole Taylor, which it held in the in the name of "Illinois Public Action Fund, Robert B. Creamer."

        c.     Defendant CREAMER was a signatory and authorized to conduct business on the Cole Taylor account on behalf of IPAF.

      4.     a.     US Bank of Oregon ("US Bank"), located in Portland Oregon and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        b.     CACCR maintained merchant credit card and checking account #0200205524 at US Bank, which it held in the name "Citizen Action Center for Consumer Rights" (hereinafter, the US Bank account").

        c.     Defendant CREAMER and Individual A, among others, were signatories and authorized to conduct business on this account on behalf of CACCR.

2

5.  a.  South Shore Bank, located in Chicago, Illinois, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

b.  IPAF held and maintained business checking account # 4994463 at South Shore Bank, which it held in the name "Illinois Citizen Action Fund, [d/b/a] Illinois Public Action Fund" (hereinafter, "South Shore IPAF account").

c.  Defendant CREAMER was a signatory and authorized to conduct business on this account on behalf of IPAF.

d.  CACCR held and maintained a business checking account # 4994489 at South Shore, which it held in the name "Citizen Action Center for Consumer Rights" (hereinafter "South Shore CACCR account").

e.  Defendant CREAMER was a signatory and authorized to conduct business on this account on behalf of CACCR.

6.  Beginning no later than in or about April 1997 and continuing until at least in or about May 1997, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROBERT B. CREAMER,

defendant herein, devised, intended to devise, and participated in a scheme to defraud Cole Taylor, South Shore and US Bank, which scheme to defraud is commonly referred to as a "check-kite," as further described in the following paragraphs.

7.  It was part of the scheme that defendant CREAMER caused insufficiently funded checks and wire transfers to be drawn on certain of the accounts he controlled and deposited into other accounts he controlled, for the purpose of creating the materially false and fraudulent appearance of balances in the recipient accounts in order to deceive the respective financial

3

institutions into honoring and paying checks and making wire transfers drawn against the accounts.

8.     It was part of the scheme that defendant CREAMER caused a series of checks to be written and drawn and wire transfers made against the US Bank account and deposited into the South Shore CACCR and South Shore IPAF accounts knowing full-well that the balance in the US Bank account was insufficient to cover the checks and wire transfers.

9.     It was further part of the scheme that defendant CREAMER caused a series of checks to be drawn against the South Shore CACCR account and deposited into the South Shore IPAF account, knowing full-well that the balance in the South Shore CACCR account was insufficient to cover the checks.

10.     It was further part of the scheme that defendant CREAMER caused a series of checks to be drawn against the South Shore IPAF account and deposited into the Cole Taylor account, knowing full-well that the balance in the South Shore IPAF account was insufficient to cover the checks.

11.     It was further part of the scheme that defendant CREAMER caused a series of wire transfers to be drawn against the Cole Taylor account and deposited into the US Bank of Oregon and South Shore IPAF accounts knowing full-well that the balance in the Cole Taylor account was insufficient to cover the wire transfers.

12.     It was further part of the scheme that defendant CREAMER maintained the fraudulently inflated balances in the aforementioned accounts by coordinating the interbank deposit of the checks and execution of wire transfers. In order to do so, defendant CREAMER, among other things:

a.     ordered and directed IPAF and CACCR employees and officers to obtain for

4

and provide to him each morning the daily opening balances held in the IPAF and CACCR accounts, including the aforementioned accounts held at Cole Taylor, South Shore and US Bank.

b. ordered and directed IPAF and CACCR employees and officers to triage and prioritize, on a daily basis, bills and other financial obligations of IPAF and CACCR, and other related entities defendant CREAMER controlled and directed, in order to determine the amount by which various account balances needed to be fraudulently inflated in order to cover the payment of such bills and financial obligations; and.

c. gave and caused to be given, on a daily basis, directions to IPAF and CACCR employees and officers regarding the interbank transfers to execute, including the form of each transfer--i.e., check or wire transfer--the means of deposit, wire transfer, teller transaction or ATM deposit, the amounts to be transferred, and the time of day by which the transfer was to be effected, in order to fraudulently inflate the account balances in amounts sufficient to fraudulently cover the payment of bills and other financial obligations defendant CREAMER had authorized.

13. It was further part of the scheme that defendant CREAMER deposited and caused the deposit of certain checks through automated teller machines for the purpose of lengthening the period of time before which the deposited checks cleared through the issuing bank, and thereby extended the period of time by which any such deposited checks would falsely inflate the balance in the recipient account.

14. It was further part of the scheme that defendant CREAMER utilized a bank located outside the Chicago area for the purpose, among others, of lengthening the period of time before

5

which checks issued against the account of the non-local financial institution would clear and, thereby, lengthening the period over which any such deposited checks would falsely inflate the balance in the recipient account.

15.     It was further part of the scheme that defendant CREAMER directed and caused the direction of Individual A to sign a series of blank checks to be drawn against the US Bank account, which checks were subsequently drawn in amounts ranging from $20,000 to $894,000 as was necessary to maintain the kite.

16.     It was further part of the scheme that IPAF employees working under the direction of defendant CREAMER carried out specific directives received directly and indirectly from defendant CREAMER in accordance with a written "Operating Manual" detailing the sequence of daily transactions and activities necessary to maintain the kite, the existence and contents of which were known by defendant CREAMER.

17.     It was further part of the scheme that defendant CREAMER knowingly utilized the fraudulently inflated balances created at Cole Taylor Bank, to pay and attempt to pay expenses relating to the day to day operation of IPAF and CACCR, including discretionary expenditures that defendant CREAMER authorized for which defendant CREAMER knew full well that IPAF and CACCR lacked the necessary funds to pay.

18.     It was further part of the scheme that defendant CREAMER knowingly utilized the fraudulently inflated balances created at Cole Taylor Bank to pay and attempt to pay his own personal salary and discretionary expenses.

19.     It was further part of the scheme that, as a result of the foregoing, defendant CREAMER caused during the period of approximately April 1 through May 27 kited deposits in

6

excess of:

        a.     approximately $24.1 million into the IPAF Cole Taylor account;

        b.     approximately $20 million into the CACCR US Bank account;

        c.     approximately $23.7 million into the South Shore IPAF account; and

        d.     approximately $11.3 million into the South Shore CACCR account.

20.    It was further part of the scheme that, as a result of the foregoing, the combined actual balance in the aforementioned accounts typically was a negative balance of in excess of $1 million and ran to as much as in excess of negative $2.6 million. At the time the scheme was discovered in May 1997, the Cole Taylor account had a negative balance exceeding $2 million.

21.    It was further part of the scheme that defendant CREAMER concealed, misrepresented, and hid and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme and acts done in furtherance of the scheme.

22.    On or about May 21, 1997, at Chicago, in the Northern District of Illinois, Eastern Division,

ROBERT B. CREAMER,

defendant herein, knowingly executed and attempted to execute the above-described scheme to defraud by depositing and causing the deposit of a worthless check numbered 1102, drawn in the amount of $936,000.00, against the South Shore CACCR account, into the South Shore IPAF account, knowing that the balance in the South Shore IPAF account was insufficient to cover the check;

In violation of Title 18, United States Code, Section 1344(1) and 2.

7

## COUNTS TWO THROUGH SEVEN

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

1.      Paragraphs 1 through 21 of Count One of this indictment are realleged and incorporated by reference as if fully set forth herein.

2.      On or about the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere

### ROBERT B. CREAMER,

defendant herein, for the purpose of executing the above-described scheme to defraud, and attempting to do so, did knowingly execute and deposit and cause the execution and deposit of a worthless check drawn against the South Shore IPAF account into the Cole Taylor account, in the following approximate amounts, knowing that the balance in the South Shore IPAF account was insufficient to cover the check;

| COUNT | DATE | CHECK # | AMOUNT |
|-------|------|---------|--------|
| Two | May 20, 1997 | 1570 | $98,000.00 |
| Three | May 20, 1997 | 1571 | $97,000.00 |
| Four | May 20, 1997 | 1572 | $96,000.00 |
| Five | May 20, 1997 | 1573 | $95,000.00 |
| Six | May 20, 1997 | 1574 | $94,000.00 |
| Seven | May 20, 1997 | 1575 | $93,000.00 |

In violation of Title 18, United States Code, Section 1344(1) and 2.

8

## COUNT EIGHT

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

1.     Paragraphs 1 through 4 of Count One of this indictment are realleged and incorporated by reference as if fully set forth herein.

2.     a.     First Bank, located in St. Paul, Minnesota, and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

       b.     CACCR held and maintained business checking account # 199700077761 at First Bank, which it held in the in the name of Citizen Action Center for Consumer Rights (hereinafter "CACCR First Bank account").

       c.     Defendant CREAMER was a signatory and authorized to conduct business on this account on behalf of CACCR.

       d.     IPAF held and maintained business checking account # 199700077787 at First Bank, which it held in the in the name of "Illinois Citizen Action Fund" (hereinafter "IPAF First Bank account").

       e.     Defendant CREAMER was a signatory and authorized to conduct business on this account on behalf of IPAF.

3.     Beginning no later than on or about December 3, 1996 and continuing until at least on or about December 31, 1996, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

### ROBERT B. CREAMER,

defendant herein, devised, intended to devise, and participated in a scheme to defraud Cole Taylor, US Bank and First Bank, which scheme to defraud is commonly referred to as a "check-kite," as

9

further described in the following paragraphs.

4.    It was part of the scheme that defendant CREAMER caused insufficiently funded checks and wire transfers to be drawn on certain of the accounts he controlled and deposited into other accounts he controlled, for the purpose of creating the materially false and fraudulent appearance of balances in the recipient accounts in order to deceive the respective financial institutions into honoring and paying checks and making wire transfers drawn against the accounts.

5.    It was further part of the scheme that defendant CREAMER caused a series of checks to be drawn against the First Bank CACCR account and deposited into the IPAF First Bank account, knowing full-well that the balance in the IPAF First Bank account was insufficient to cover the checks.

6.    It was further part of the scheme that defendant CREAMER caused a series of checks and a wire transfer to be drawn against the IPAF First Bank account and deposited into the Cole Taylor account, knowing full-well that the balance in the IPAF First Bank account was insufficient to cover the checks and wire transfer.

7.    It was further part of the scheme that defendant CREAMER caused a series of wire transfers and a check to be drawn against the Cole Taylor account and deposited into the US Bank account knowing full-well that the balance in the Cole Taylor account was insufficient to cover the wire transfers and check.

8.    It was part of the scheme that defendant CREAMER caused a series of wire transfers to be made against the US Bank account and deposited into the First Bank CACCR account knowing full-well that the balance in the US Bank account was insufficient to cover the  wire transfers.

9.    It was further part of the scheme that defendant CREAMER maintained the

fraudulently inflated balances in the aforementioned accounts by coordinating the interbank deposit of the checks and execution of wire transfers. In order to do so, defendant CREAMER, among other things:

a.      ordered and directed IPAF and CACCR employees and officers to obtain for and provide to him each morning the daily opening balances held in the IPAF and CACCR accounts, including the aforementioned accounts held at Cole Taylor, US Bank and First Bank;

b.      ordered and directed IPAF and CACCR employees and officers to triage and prioritize, on a daily basis, bills and other financial obligations of IPAF and CACCR, and other related entities defendant CREAMER controlled and directed, in order to determine the amount by which various account balances needed to be fraudulently inflated in order to cover the payment of such bills and financial obligations; and

c.      gave and caused to be given, on a daily basis, directions to IPAF and CACCR employees and officers regarding the interbank transfers to execute, including the form of each transfer--i.e., check or wire transfer--the means of deposit, the amounts to be transferred, and the time of day by which the transfer was to be effected, in order to fraudulently inflate the account balances in amounts sufficient to fraudulently cover the payment of bills and other financial obligations defendant CREAMER had authorized.

10.      It was further part of the scheme that defendant CREAMER deposited and caused the deposit of certain checks through automated teller machines for the purpose of lengthening the period of time before which the deposited checks cleared through the issuing bank, and thereby extended the period of time by which any such deposited checks would falsely inflate the balance

11

in the recipient account.

11. It was further part of the scheme that defendant CREAMER utilized a bank located outside the Chicago area for the purpose, among others, of lengthening the period of time before which checks issued against the account of the non-local financial institution would clear and, thereby, lengthening the period over which any such deposited checks would falsely inflate the balance in the recipient account.

12. It was further part of the scheme that defendant CREAMER knowingly utilized the fraudulently inflated balances created in the IPAF First Bank account and Cole Taylor Bank to directly and indirectly pay and attempt to pay expenses relating to the day to day operation of IPAF and CACCR, including discretionary expenditures that defendant CREAMER authorized for which defendant CREAMER knew full well that IPAF and CACCR lacked the requisite funds to pay.

13. It was further part of the scheme that defendant CREAMER knowingly utilized the fraudulently inflated balances created at Cole Taylor Bank to pay and attempt to pay his own personal salary and discretionary expenses.

14. It was further part of the scheme that, as a result of the foregoing, defendant CREAMER caused during the period of on or about December 3, 1996 through on or about December 31, 1996 kited deposits in excess of:

        a.     approximately $4.1 million into the Cole Taylor account;

        b.     approximately $3.1 million into the US Bank account;

        c.     approximately $3.2 million into the CACCR First Bank account; and

        d.     approximately $4.2 million into the IPAF First Bank account.

15. It was further part of the scheme that, as a result of the foregoing, the combined actual

12

daily balance in the aforementioned accounts during the period of December 4, 1996 through December 24, 1996 was a negative balance that in excess of approximately $70,000 and ran to as much as in excess of negative $900,000.

16.     It was further part of the scheme that defendant CREAMER concealed, misrepresented, and hid and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme and acts done in furtherance of the scheme.

17.     On or about December 13, 1996, at Chicago, in the Northern District of Illinois, Eastern Division,

ROBERT B. CREAMER,

defendant herein, knowingly executed and attempted to execute the above-described scheme to defraud by depositing and causing the deposit of a worthless check numbered 1051, drawn in the amount of $ 89,000.00 against the IPAF First Bank account, into the Cole Taylor account, knowing that the balance in the IPAF First Bank account was insufficient to cover the check;

In violation of Title 18, United States Code, Section 1344(1) and 2.

## COUNTS NINE THROUGH TWELVE

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

1.   Paragraphs 1 through 16 of Count Seven of this indictment are realleged and incorporated by reference as if fully set forth herein.

2.   On or about the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere

### ROBERT B. CREAMER,

defendant herein, for the purpose of executing the above-described scheme to defraud, and attempting to do so, did knowingly deposit and cause the deposit of a worthless check drawn against the IPAF First Bank account into the Cole Taylor account, in the following approximate amounts, knowing that the balance in the IPAF First Bank account was insufficient to cover the check;

| COUNT | DATE | CHECK # | AMOUNT |
|-------|------|---------|--------|
| Nine | December 16, 1996 | 1053 | $99,000.00 |
| Ten | December 16, 1996 | 1056 | $98,500.00 |
| Eleven | December 16, 1996 | 1057 | $64,000.00 |
| Twelve | December 16, 1996 | 1058 | $98,000.00 |

In violation of Title 18, United States Code, Section 1344 (1) and 2.

14

## COUNT THIRTEEN

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

At times material to this indictment:

1.     Paragraph 1 of Count One of this indictment is realleged and incorporated by reference as if fully set forth herein.

2.     a.     Defendant CREAMER was corporate Secretary-Treasurer and Executive Director of National Consumers Foundation ("NCF"), which functioned as a sister organization of IPAF.

       b.     Individual A was the registered agent and a corporate officer of NCF.

       c.     NCF was a not for profit entity registered in the State of Illinois and conducted business from, among other places, offices in Chicago, Illinois.

       d.     As Executive Director, defendant CREAMER functioned as the chief operating officer of NCF, responsible for its day to day operations. In that capacity, defendant CREAMER, both directly, and through the actions of his subordinates, controlled and directed the daily administration and management of the finances of NCF, including the management of its corporate bank account.

3.     a.     Bank One, NA ("Bank One") located in LaGrange, Illinois, and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

       b.     IPAF held and maintained business checking account # 100178103 at Bank One, which it held in the in the name of "Illinois Public Action Fund."

       c.     Defendant CREAMER was a signatory and authorized to conduct business

15

on the Bank One account on behalf of IPAF.

    4.    a.    HomeBanc, FSB ("HomeBanc"), located in Rockford, Illinois, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        b.    IPAF held and maintained business checking account # 0130002860 at HomeBanc, which it held in the in the name of "Illinois Public Action Fund."

        c.    Defendant CREAMER was a signatory and authorized to conduct business on the HomeBanc account on behalf of IPAF.

    5.    a.    Devon Bank, located in Chicago, Illinois, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        b.    IPAF held and maintained business checking account # 1548503-01 at Devon Bank, which it held in the in the name of "Public Action."

        c.    Defendant CREAMER was a signatory and authorized to conduct business on the Devon Bank account on behalf of IPAF.

    6.    a.    NBD Bank, located in Chicago, Illinois and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

        b.    NCF held and maintained business checking account # 385001235436 at NBD Bank, which it held in the in the name of "National Consumers Foundation."

        c.    Defendant CREAMER was a signatory and authorized to conduct business on the NBD Bank account on behalf of NCF.

    7.    a.    Mid-America National Bank, located in Chicago, Illinois and elsewhere, was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation.

b. NCF held and maintained business checking account # 33-0178-8 at Mid-America National Bank, which it held in the in the name of "National Consumers Foundation."

c. Defendant CREAMER was a signatory and authorized to conduct business on the Mid-America National Bank account on behalf of NCF.

8. Beginning no later than in or about October 1993 and continuing until at least in or about December 1993, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROBERT B. CREAMER,

defendant herein, devised, intended to devise, and participated in a scheme to defraud Bank One, HomeBanc, Devon Bank, NBD Bank and Mid-America National Bank, which scheme to defraud is commonly referred to as a "check-kite," as further described in the following paragraphs.

9. It was part of the scheme that defendant CREAMER caused insufficiently funded checks and wire transfers to be drawn on certain of the accounts he controlled and deposited into other accounts he controlled, for the purpose of creating the materially false and fraudulent appearance of balances in the recipient accounts in order to deceive the respective financial institutions into honoring and paying checks and making wire transfers drawn against the accounts.

10. It was part of the scheme that defendant CREAMER caused a series of checks to be written and drawn against the aforementioned Bank One account and deposited into the Mid-America National Bank and NBD Bank accounts knowing full-well that the balance in the Bank One account was insufficient to cover the checks.

11. It was further part of the scheme that defendant CREAMER caused a series of checks to be written and drawn against the Mid-America National Bank account and deposited into the

17

Devon Bank account, knowing full-well that the balance in the Mid-America National Bank account was insufficient to cover the checks.

12.     It was further part of the scheme that defendant CREAMER caused a series of checks to be written and drawn against the NBD Bank account and deposited into the Devon Bank account, knowing full-well that the balance in the NBD Bank account was insufficient to cover the checks.

13.     It was further part of the scheme that defendant CREAMER caused a series of checks to be written and drawn against the Devon Bank account and deposited into the HomeBanc and Bank One accounts, knowing full-well that the balance in the Devon Bank account was insufficient to cover the checks.

14.     It was further part of the scheme that defendant CREAMER caused a series of checks to be written and drawn against the HomeBanc account and deposited into the Bank One accounts, knowing full-well that the balance in the HomeBanc account was insufficient to cover the checks.

15.     It was further part of the scheme that defendant CREAMER deposited and caused the deposit of certain checks through automated teller machines for the purpose of lengthening the period of time before which the deposited checks cleared through the issuing bank, and thereby extended the period of time by which any such deposited checks would falsely inflate the balance in the recipient account.

16.     It was further part of the scheme that defendant CREAMER utilized a bank located outside the Chicago area for the purpose, among others, of lengthening the period of time before which checks issued against the account of the non-local financial institution would clear and, thereby, lengthening the period over which any such deposited checks would falsely inflate the balance in the recipient account.

18

17.   It was further part of the scheme that defendant CREAMER knowingly utilized the fraudulently inflated balances created at Devon Bank and Mid-America National Bank to pay and attempt to pay expenses relating to the day to day operation of IPAF and NCF, including discretionary expenditures that defendant CREAMER authorized for which defendant CREAMER knew full well that IPAF and NCF lacked the requisite funds to pay.

18.   It was further part of the scheme that, as a result of the foregoing, defendant CREAMER, during the period of approximately October 1, 1993 through December 1, 1993, caused kited deposits in excess of approximately:

    a.   $7.8 million into the Bank One account;

    b.   $6.8 million into the HomeBanc account;

    c.   $7.4 million into the Devon Bank account;

    d.   $4.2 million into the NBD Bank account; and

    e.   $3.0 million into the Mid-America National Bank account.

19.   It was further part of the scheme that, as a result of the foregoing, the combined actual balance in the aforementioned accounts during the period of the scheme typically was a negative balance in the range of in excess of $600,000 to nearly $900,000. At the time the scheme was discovered in December 1993, the Devon Bank, HomeBanc and Mid-America Bank accounts each had negative balances well in excess of $100,000.

20.   It was further part of the scheme that defendant CREAMER concealed, misrepresented, and hid and caused to be concealed, misrepresented and hidden, the existence and purpose of the scheme and acts done in furtherance of the scheme.

21.   On or about December 13, 1996, at Chicago, in the Northern District of Illinois,

19

Eastern Division,

## ROBERT B. CREAMER,

defendant herein, knowingly executed and attempted to execute the above-described scheme to defraud by depositing and causing the deposit of a worthless check numbered 4335, drawn in the amount of $13,572.00 against Mid-America National Bank account, into the Devon Bank account, knowing that the balance in the Mid-America National Bank account was insufficient to cover the check;

In violation of Title 18, United States Code, Section 1344(1) and 2.

## COUNTS FOURTEEN THROUGH SIXTEEN

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

1.     Paragraphs 1 through 20 of Count Thirteen of this indictment are realleged and incorporated by reference as if fully set forth herein.

2.     On or about the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere

### ROBERT B. CREAMER,

defendant herein, for the purpose of executing the above-described scheme to defraud, and attempting to do so, did knowingly deposit and cause the deposit of a worthless check drawn against the Devon Bank account into the HomeBanc account, in the following approximate amounts, knowing that the balance in the Devon Bank account was insufficient to cover the check;

| COUNT | DATE | CHECK # | AMOUNT |
|---|---|---|---|
| Fourteen | October 4, 1993 | 8021 | $14,200.00 |
| Fifteen | November 24, 1993 | 8533 | $13,406.00 |
| Sixteen | December 9, 1993 | 8704 | $13,721.00 |

In violation of Title 18, United States Code, Section 1344(1) and 2.

## COUNTS SEVENTEEN THROUGH TWENTY

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

1.     Paragraph 1 of Count One of the Indictment is realleged and incorporated by reference as if fully set forth herein.

2.     For each of the quarters ending on or about the dates set forth below, each such quarter constituting a separate count of this indictment, defendant CREAMER was required to collect, account for, and pay over the federal income taxes, Federal Insurance Contribution Act ("FICA") taxes and Medicare withholdings of the employees of IPAF. On or about each of the tax payment dates set forth below, in the Northern District of Illinois, Eastern Division,

### ROBERT B. CREAMER,

defendant herein, willfully did fail to collect, account for and pay over to the Internal Revenue Service approximately the following amounts in federal income tax withholdings and FICA taxes and Medicare withholdings due and owing to the United States of America for the specified quarter on wages paid to employees of IPAF;

| COUNT | Quarter Ending | Tax Payment Date | Income Tax/ FICA/Medicare Withholdings |
|---|---|---|---|
| Seventeen | Sept. 30, 1996 | Oct. 30, 1996 | $101,191 |
| Eighteen | Dec. 31, 1996 | Jan. 30, 1998 | $77,307 |
| Nineteen | Mar. 31, 1997 | April 30, 1998 | $76,553 |
| Twenty | June 30, 1997 | July 30, 1998 | $58,393 |

In violation of Title 26, United States Code, Section 7202.

22

## COUNTS TWENTY-ONE THROUGH THIRTY

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

At times material to this indictment:

      1.      Issue Dynamics, Inc. (IDI) was a registered Illinois corporation with offices located at 1101 Ridge Avenue, Evanston Illinois. IDI held itself out to the public as being engaged in the provision of, among other things, political consulting services.

      2.      Defendant ROBERT B. CREAMER was the president, registered agent, sole shareholder and sole employee of IDI.

      3.      For each of the quarters ending on or about the dates set forth below, each such quarter constituting a separate count of this indictment, defendant CREAMER was required to collect, account for, and pay over the federal income taxes, Federal Insurance Contribution Act ("FICA") taxes and Medicare withholdings of the employees of IDI. On or about each of the tax payment dates set forth below, in the Northern District of Illinois, Eastern Division,

ROBERT B. CREAMER,

defendant herein, willfully did fail to collect, account for and pay over to the Internal Revenue Service approximately the following amounts in federal income tax withholdings, FICA taxes and Medicare withholdings due and owing to the United States of America for the specified quarter on wages paid to defendant CREAMER, the sole employee of IDI;

| COUNT | Quarter Ending | Tax Payment Date | Income Tax/ FICA/Medicare Withholdings |
|---|---|---|---|
| Twenty-One | Dec. 30, 1997 | Jan. 30, 1998 | $1,892 |
| Twenty-Two | Mar. 31, 1998 | April 30, 1998 | $1,839 |

| Twenty-Three | June 30, 1998 | July 30, 1998 | $3,962 |
| Twenty Four | Sept. 30, 1998 | Oct. 30, 1998 | $7,901 |
| Twenty Five | Dec. 31, 1998 | Jan. 30, 1999 | $7,053 |
| Twenty-Six | Mar. 31, 1999 | April 30, 1999 | $7,959 |
| Twenty-Seven | June 30, 1999 | July 30, 1999 | $7,480 |
| Twenty-Eight | Sept. 30, 1999 | Oct. 30, 1999 | $3,836 |
| Twenty-Nine | Dec. 31, 1999 | Jan. 30, 2000 | $3,753 |
| Thirty | Mar. 31, 2000 | April 30, 2001 | $4,331 |

In violation of Title 26, United States Code, Section 7202.

## COUNT THIRTY-ONE

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

On or about April 13, 1997, in the Northern District of Illinois, Eastern Division,

### ROBERT B. CREAMER,

defendant herein, who during the calendar year 1996 was a resident of Evanston, Illinois, willfully did make and subscribe and did cause to be made and subscribed a United States Individual Income tax return (Form 1040 and accompanying schedules) for the calendar year 1996, on behalf of himself and his spouse, which return was supported by a false and fraudulent Form W-2 that defendant CREAMER had caused to be prepared, was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it stated in that return:

1.      That the federal income tax withheld from Forms W-2 and 1099 was $23,224 (line 52) and the total payments of taxes for the 1996 calendar year were $23,224 (line 58); when, in fact, as defendant ROBERT B. CREAMER well knew and believed, total payments of taxes were substantially less than this figure because he had claimed withholding tax payments from his employer, Illinois Public Action Fund, of which defendant CREAMER was Executive Director, which defendant CREAMER knew he had not paid or caused to be paid to the Internal Revenue Service.

2.      That the total tax balance owed for the 1996 calendar year was $5,106 (line 62); when, in truth and in fact, as defendant CREAMER then well knew, the total tax balance owed was substantially greater than this amount due to the failure by defendant CREAMER to have caused Illinois Public Action Fund, of which he was Executive Director, to pay withholding taxes to the

Internal Revenue Service;

In violation of Title 26, United states Code, Section 7206(1).

## COUNT THIRTY-TWO

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

On or about October 9, 1998, in the Northern District of Illinois, Eastern Division,

### ROBERT B. CREAMER,

defendant herein, who during the calendar year 1997 was a resident of Evanston, Illinois, willfully did make and subscribe and did cause to be made and subscribed, a United States Individual Income tax return (Form 1040 and accompanying schedules) for the calendar year 1997, on behalf of himself and his spouse, which return was supported by false and fraudulent Forms W-2 that defendant CREAMER had caused to be prepared, was verified by a written declaration that it was made under penalties of perjury, and was filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it stated in that return:

1.  That the federal income tax withheld from Forms W-2 and 1099 for the 1997 calendar year was $15,352 (line 52), the additional payment of taxes in filing an IRS Form 4868 (request for extension) was $8,100 (line 57) and the total payments of taxes for the 1997 tax year were $23,452 (line 60), when, in fact, as defendant ROBERT B. CREAMER well knew and believed, total payments of taxes were substantially less than this figure because he had claimed withholding tax payments from his employer, Illinois Public Action Fund, of which defendant CREAMER was Executive Director, and Issue Dynamics, Inc., of which defendant CREAMER was President, which defendant CREAMER knew he had not paid or caused to be paid to the Internal Revenue Service.

2.  That taxes were overpaid in the amount of $47 (line 61) when, in truth and in fact, as he then well knew and believed that there was not an overpayment of taxes but, instead, taxes owed to the Internal Revenue Service due to the failure by defendant CREAMER to have caused

27

Illinois Public Action Fund, of which he was Executive Director of which he was Executive Director, and Issue Dynamics, Inc., of which he was President, to pay withholding taxes to the Internal Revenue Service;

In violation of Title 26, United States Code, Section 7206(1).

<u>COUNT THIRTY-THREE</u>

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

On or about October 12, 1999, in the Northern District of Illinois, Eastern Division,

ROBERT B. CREAMER,

defendant herein, who during the calendar year 1998 was a resident of Evanston, Illinois, willfully did make and subscribe and did cause to be made and subscribed, a United States Individual Income tax return (Form 1040 and accompanying schedules) for the calendar year 1998, on behalf of himself and his spouse, which return was supported by a false and fraudulent Form W-2 that defendant CREAMER had caused to be prepared, was verified by a written declaration that it was made under penalties of perjury and was filed with the Internal Revenue Service, which return he did not believe to be true and correct as to every material matter, in that it stated in that return:

1. That the federal income tax withheld for the 1998 calendar year was $21,393 (line 57), the additional payment of taxes in filing an IRS Form 4868 (request for extension) was $8,000 (line 61) and the total payment of taxes for the 1998 tax year was $29,440 (line 64), when, in fact, as defendant ROBERT B. CREAMER well knew and believed, total payments of taxes were substantially less than this figure because he had claimed withholding tax payments from his employer, Issue Dynamics, Inc., of which defendant CREAMER was President, which defendant CREAMER knew he had not paid or caused to be paid to the Internal Revenue Service.

2. That the total tax balance owed for the 1998 calendar year was $13,987 (line 62); when, in truth and in fact, as defendant CREAMER then well knew and believed, the total tax owed was substantially greater than this amount due to the failure by defendant CREAMER to have caused Issue Dynamics, Inc., of which he was President, to pay withholding taxes to the Internal Revenue

29

Service;

In violation of Title 26, United states Code, Section 7206(1).

**COUNT THIRTY-FOUR**

The SPECIAL SEPTEMBER 2002 GRAND JURY further charges:

On or about October 12, 2000, in the Northern District of Illinois, Eastern Division,

**ROBERT B. CREAMER,**

defendant herein, who during the calendar year 1999 was a resident of Evanston, Illinois, willfully

did make and subscribe and did cause to be made and subscribed, a United States Individual Income

tax return (Form 1040 and accompanying schedules) for the calendar year 1999, on behalf of himself

and his spouse, which return was supported by a false and fraudulent Form W-2 that defendant

CREAMER had caused to be prepared, was verified by a written declaration that it was made under

penalties of perjury, and was filed with the Internal Revenue Service, which return he did not believe

to be true and correct as to every material matter, in that it stated in that return:

1.    That the federal income tax withheld for the 1999 calendar year was $47,115 (line

57), the additional payment of taxes in filing an IRS Form 4868 (request for extension) was $2,000

(line 61) and the total payment of taxes for the 1999 tax year was $49,115 (line 64), when, in fact,

as defendant ROBERT B. CREAMER well knew and believed, total payments of taxes were

substantially less than this figure because he had claimed withholding tax payments from his

employer, Issue Dynamics, Inc., of which defendant CREAMER was President, which defendant

CREAMER knew he had not paid or caused to be paid to the Internal Revenue Service.

2.    That taxes were overpaid in the amount of $6,144 (line 65) when, in truth and in fact,

as he then well knew and believed that there was not an overpayment of taxes but, instead, taxes

owed to the Internal Revenue Service due to the failure by defendant CREAMER to have caused

Issue Dynamics, Inc., of which he was President, to pay withholding taxes to the Internal Revenue

31

Service;

In violation of Title 26, United states Code, Section 7206(1).

A TRUE BILL:

FOREPERSON

UNITED STATES ATTORNEY

32

No.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

vs.

ROBERT B. CREAMER

**I N D I C T M E N T**

Violation(s): 18 U.S.C. §§ 1344 and 2, 7202, 7206(1)

A true bill,

_____
Foreman

Filed in open court this _____ day of _MARCH_ , A.D. _2004_

**MICHAEL W. DOBBINS**
Clerk

By _____, Deputy Clerk