

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 04 CR 281 |
| | ) | |
| ROBERT B. CREAMER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The government accuses defendant Robert B. Creamer of committing bank fraud under 18 U.S.C. § 1344, and tax violations under 26 U.S.C. §§ 7202 and 7206. The section 1344 charges stem from a check kiting scheme that defendant allegedly orchestrated while he served as director of several non-profit organizations. The section 7202 charges arise from defendant's alleged failure to pay withholding taxes to the Internal Revenue Service (IRS). The section 7206 charges relate to false statements that defendant allegedly made on his personal tax returns. Defendant has now filed seven pretrial motions in which he seeks the following grounds of relief: dismissing the section 7202 charges as untimely; dismissing all counts due to pre-indictment delay; severing the bank fraud and tax counts; dismissing the § 7206 charges for failing to state an offense; and three discovery-related motions which request that the government disclose certain categories of evidence. For the following reasons, defendant's motions are granted in part and denied in part.

## BACKGROUND

Defendant is the former director of several non-profit organizations that addressed primarily consumer advocacy issues. Those organizations were the Illinois Public Action Fund (IPAF), the Citizen Action Center for Consumer Rights (CACCR), and the National

Consumers Foundation (NCF). The government alleges that defendant executed three separate check-kiting schemes in 1993, 1996 and 1997, during his tenure at those organizations. A check-kiting scheme "involves the knowing drafting and depositing of a series of overdraft checks between two or more federally insured banks with the purpose of artificially inflating bank balances so that checks can be drawn on accounts that actually have negative funds." United States v. LeDonne, 21 F.3d 1418, 1425, n.2 (7th Cir. 1994). According to the government, the defendant drew insufficiently-funded checks on the organizations' bank accounts and then deposited those checks in other bank accounts held by the same organizations in order to create the appearance of positive account balances. He then drew money from those accounts in order to pay the organizations' operational expenses. Responding to those allegations, defendant claims that the organizations had access to a large reservoir of funds to sustain their operations and that this reservoir of funds was sufficient to cover the organizations' bank debts.

The schemes were allegedly executed in similar fashion, and the illustration of one scheme provides an adequate background for all. In Count 1 the government alleges that in 1997 defendant drew insufficiently-funded checks on an account held by CACCR at US Bank of Oregon (US Bank), and then deposited them into accounts at South Shore Bank that were held by CACCR and IPAF. Defendant then drew insufficiently-funded checks on the CACCR account at South Shore Bank and deposited them into the IPAF account at South Shore Bank. Next, defendant drew insufficiently-funded checks on the IPAF account at South Shore Bank and deposited them into an IPAF account at Cole Taylor Bank. Defendant then issued insufficiently-funded wire transfers against the IPAF account at Cole Taylor and deposited them into the CACCR account at US Bank and the South Shore account of IPAF. Thus,

according to the government, defendant allegedly used the organizations' accounts at the different banks to create a circuit through which he passed insufficiently-funded checks and wire transfers in order to maintain the appearance of positive balances, from which he withdrew funds to support the organizations.

The sums at stake were substantial. According to the government, the combined balance of the organizations' accounts during the 1997 kite ranged from negative $1 million to more than negative $2.6 million. Counts 2 through 7 each relate to the issuance of one in a series of six checks, which ranged from $93,000 to $98,000 in value. The combined daily balance during the 1996 check-kiting scheme ranged from negative $70,000 to more than negative $900,000. Counts 9 through 12 relate to a series of kited checks that were drawn in amounts from $64,000 to $99,000. The combined balance of the organizations' accounts during the 1993 scheme ranged from negative $600,000 to approximately negative $900,000. Finally, Counts 14 through 16 address three kited checks, which ranged from $13,721 to $14,200 in value.

In Counts 17 through 30 the government accuses defendant of violating § 7202 by failing to pay to the IRS withholding taxes during specific fiscal quarters between 1996 and 2000. Counts 17 through 20 charge defendant with failing to pay taxes withheld from IPAF employees. Defendant left IPAF in 1997 and formed Issue Dynamics, Inc. (IDI), a political consulting firm where defendant was president and also the sole employee. Counts 21 through 30 charge that defendant failed to make ten payments reflecting taxes that he withheld at IDI. In his defense, defendant asserts that neither he nor any of the organizations that he directed ever misrepresented the amount of taxes owed.

Counts 31 through 34 charge defendant with making false statements on personal tax

returns he filed between the years 1996 through 1999. Specifically, the government claims that defendant included withholding taxes on the 1040 forms when he knew that no withholding taxes were actually paid over to IRS. Defendant moves to dismiss these counts, and argues that the relevant line on Form 1040 asks only for taxes that were withheld, and not taxes that were paid to the IRS. He further contends that a taxpayer may include amounts withheld, even if the taxpayer's employer never paid those sums to the IRS.

The grand jury returned a 34-count indictment against defendant on May 10, 2004. Before the indictment's issuance, defendant and the government entered into an agreement whereby defendant agreed to toll the statute of limitations period for all counts on May 31, 2003. If not for that agreement, the government could not pursue Counts 13 through 16, which relate to the 1993 bank fraud, as the relevant statute of limitations period for § 1344 offenses is ten years.

As is evident from the description above, the charges against defendant divide into two categories: bank fraud and tax violations. And, within those two categories, the charges relate to defendant's professional business life and his personal life. The charges do overlap, but defendant says the similarities are insufficient to justify the joinder of the bank fraud and tax violations. Further, over a decade passed between the first check-kiting activity and the indictment. Defendant claims that the government's delay in bringing its case against him is sufficiently prejudicial to warrant dismissal of the entire indictment. That contention, along with defendant's remaining arguments, are discussed below in detail.

## DISCUSSION

### Defendant's Motion to Dismiss All Counts for Pre-Indictment Delay

Defendant seeks to dismiss all counts in the indictment due to the pre-indictment delay.

This is defendant's second argument, but the court addresses it first because defendant's success on this claim could conceivably moot his remaining arguments. However, defendant does not prevail here since he cannot demonstrate with requisite specificity that the government's lengthy pre-indictment delay caused him actual and substantial prejudice.

Defendant focuses primarily on the bank fraud counts, and specifically those stemming from the alleged 1993 check-kiting scheme. As for the tax counts, defendant contends that the government joined them in order to portray the bank fraud counts as timely. Over ten years passed between the alleged 1993 bank fraud and defendant's indictment on March 10, 2004. As noted above, if not for defendant's agreement to toll the statute of limitations period on March 31, 2003, the government would not be able to pursue the 1993 offenses. Defendant claims that the pre-indictment delay has caused him to lose three sources of valuable information. He identifies financial records relating to IPAF, NCF and CACCR that were destroyed; a business associate and personal friend, Mirron Alexandroff, who died in 2001; and other witnesses' memories, which have faded, as sources of evidence that he may no longer use to assist his defense. Defendant contends that if he had access to that evidence he would have used it to demonstrate that he never intended to expose the banks to actual or potential losses, and that the organizations, particularly IPAF, had sufficient funds to cover any overdrafts. Without those sources of information, defendant believes that his defense suffers severe prejudice. In response, the government argues that all of the charges have been brought within the time periods set by the relevant statutes of limitations. The government also labels plaintiff's lost evidence as insufficient to establish prejudice. Lastly, the government asserts that the delay was not due to any impermissible purpose.

The primary safeguard to a timely indictment is a statute of limitations. *See* United States v. Sowa, 34 F.3d 447, 450 (7th Cir. 1994); United States v. Henderson, 337 F.3d 914, 919 (7th Cir. 2003); United States v. Pardue, 134 F.3d 1316, 1319 (7th Cir. 1998) ("A defendant's primary protection against overly stale criminal charges is the applicable statute of limitations, which is the legislative limit on prosecutorial delay."). Still, charges filed within the statute of limitations may violate the Due Process Clause of the Fifth Amendment, which "plays a limited role in protecting a defendant from undue prosecutorial delay." United States v. Smith, 80 F.3d 1188, 1191 (7th Cir. 1996). To show that a pre-indictment delay violates due process, a defendant "must prove that the delay caused actual and substantial prejudice to his fair trial rights, and there must be a showing that the government delayed indictment to gain a tactical advantage or some other impermissible reason." Sowa, 34 F.3d at 450. Defendant's showing of actual and substantial prejudice must be "'specific, concrete, and supported by evidence.'" *Id.* quoting Pharm v. Hatcher, 984 F.2d 783, 787 (7th Cir. 1993). That showing has also been described as "exacting" (United States v. McMutuary, 217 F.3d 477, 482 (7th Cir. 2000)), and "quite stringent." United States v. Hunter, 197 F.3d 862, 865 (7th Cir. 1999). "Vague, speculative, or conclusory allegations" of harm are insufficient to establish prejudice. United States v. Canoy, 38 F.3d 893, 902 (7th Cir. 1994); United States v. Spears, 159 F.3d 1081, 1084 (7th Cir. 1998). After the defendant shows that the delay caused him actual and substantial prejudice, the government "must come forward and provide its reasons for the delay." Sowa, 34 F.3d at 451. Finally, after the government explains the delay, its reasons "are balanced against the defendant's prejudice to determine whether the defendant has been denied due process." *Id.* Due process is not violated if the delay "is legitimately investigative in nature." *Id.* Due process "is only implicated if the government purposely delayed the

indictment to take advantage, tactically, of the prejudice or otherwise acted in bad faith." *Id.* at 450. In <u>Sowa</u>, the court recognized that it "has never characterized a pre-indictment delay as a constitutional violation." *Id.* Over ten years have passed since <u>Sowa</u> was decided, and the court's observation remains unchanged.

Defendant describes Alexandroff as a longtime friend who could "provide distinctive insight into [defendant's] operation of IPAF and [defendant's] utter lack of fraudulent intent in the financing of the organization." Alexandroff served on IPAF's Board of Directors and was also a personal friend of defendant. Defendant asserts that Alexandroff thus had a unique dual perspective – an overview of IPAF due to his role on the board, and a window into defendant's state-of-mind due to his friendship. According to defendant, he and Alexandroff discussed financial matters during 1996 and 1997. Defendant argues that Alexandroff would have testified to defendant's lack of intent to defraud any bank, and also that there is no other source for this testimony. In response, the government advances three arguments: despite his role on the Board of Directors, Alexandroff lacked knowledge of IPAF's day-to-day banking affairs; if Alexandroff actually knew about IPAF's financial affairs, then he would have been a co-schemer; and further, Alexandroff's testimony would have been inadmissible hearsay.

The Court of Appeals has been clear that the death or unavailability of a witness during a pre-indictment delay is not sufficient to establish actual and substantial prejudice. *See* <u>Henderson</u>, 337 F.3d at 920; <u>United States v. Perry</u>, 815 F.2d 1100, 1103 (7th Cir. 1987). When a witness dies, the defendant claiming prejudice must prove "that the missing witness would have testified on the defendant's behalf, would have withstood cross-examination, and would have been a credible witness before the jury." <u>Canoy</u>, 38 F.3d at 902. Defendant does make a generalized showing as to the factors, but he must detail specifics and not generalities and

vagaries. *See* <u>United States v. Koller</u>, 956 F.2d 1408, 1416 (7th Cir. 1992) ("The defendant must also allege more than that a particular witness is no longer available and that his testimony would have been favorable to the defense."). Defendant's showing falls far short of the prejudice demonstrated in the rare instance of dismissal for pre-indictment delay, <u>United States v. Sabath</u>, 990 F. Supp. 1007 (N.D. Ill. 1998). In that case three key witnesses died during the delay, and in support of his motion to dismiss the defendant submitted evidence to support the deceased witnesses' testimony. Defendant presents no similar evidence that corroborates what he posits Alexandroff would have said. It is more than probable that other IPAF employees were familiar with the organization's finances and also knew defendant on a personal level. And it is implausible that Alexandroff was the only person with whom defendant discussed IPAF's finances. Defendant's unsupported portrayal of Alexandroff as the ultimate insider is bereft of the concrete and specific evidence necessary to establish prejudice.

Next, defendant claims prejudice due to the fact that financial records from IPAF, NCF and CACCR were discarded in or around 1999. The mere loss of records during a pre-indictment delay is not enough to establish prejudice. <u>Spears</u>, 159 F.3d at 1085. Defendant must show what the records would have shown and how they would have helped his defense. <u>Canoy</u>, 38 F.3d at 902-03. Defendant asserts that had the government indicted the case in a timely manner he would have used the records to establish that the organizations had sufficient funds to reimburse the banks, and that he thus lacked any intent to defraud. Defendant further argues that the loss of the records prevents him from arguing that no bank suffered actual monetary losses, which, in his view, evidences that he did not intend to defraud any bank. These arguments fail to establish actual and substantial prejudice.

Section 1344 does not require that the victim bank actually suffer any loss. *See* 18 U.S.C. § 1344; Neder v. United States, 527 U.S. 1, 24-25 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages' ... plainly have no place in the federal fraud statutes."); United States v. Barrett, 178 F.3d 643, 648 (2d Cir. 2000) ("[A]ctual or potential loss to the bank is not an element of the crime of bank fraud but merely a description of the required criminal intent."); United States v. Mason, 902 F.2d 1434, 1441 (9th Cir. 1990) ("[A] federally supported financial institution need not incur a 'loss' in order to be a victim of 'false or fraudulent pretenses, representations, or promises.'"). Even if actual loss was relevant, the banks' own records could adequately show what losses, if any, they actually suffered due to defendant's alleged check-kiting scheme. Thus, even if defendant had the records, and assuming that they showed his organizations had sufficient funds to cover the checks, and that no bank actually suffered any loss, he could still be convicted under section 1344. There is yet another reason why the absence of the organizations' financial records does not sufficiently prejudice defendant. The loss of those records does not preclude defendant from showing that he did not intend to commit bank fraud because any specifically identifiable funds received by the organizations would be noted in at least two locations: the organizations' records and the records held by the sources of those funds. Thus, those sources, whether they be banks, contributors, or other lenders, may establish the financial situations at the organizations. Using the records from those sources, defendant may show that the organizations had or expected to receive sufficient funds to reimburse the banks, and thus support his claim that he never intended to defraud the banks. However, defendant has not made a specific showing that these records are unavailable.

Defendant also argues that he suffers prejudice due to the "enormous task" of finding

witnesses and reconstructing their memories that have eroded over time.  Defendant asserts

that task has been complicated by the many organizational and institutional changes that

several of the banks have experienced.  This is clearly the weakest of defendant's arguments,

for he does not point to any specific and concrete evidence, and the general category of lost

evidence – faded memories – is vague and insufficient.  *See* <u>Koller</u>, 956 F.2d at 1416

("Allegations that witnesses' memories have faded is not enough.").  A defendant's burden of

proving prejudice in pre-indictment delay cases has been described as a "monumental hurdle"

(<u>Sowa</u>, 34 F.3d at 451), which is an appropriate image because the defendant must construct

with detail and specificity that which is lost and unavailable.  Here, defendant does not provide

any potential witnesses – what they would say and how their testimony would help his defense.

*See* <u>Aleman v. Honorable Judges</u>, 138 F.3d 302, 310 (7th Cir. 1998) ("It is not enough simply

to speculate . . . that witnesses' memories might have faded because of the passage of time.").

        As is the case with his arguments relating to Alexandroff and the lost records,

defendant fails to point to any evidence to corroborate that those sources of information would

actually support his defense.  *See* <u>United States v. Sample</u>, 565 F. Supp. 1166, 1178-79 (N.D.

Ill. 1983).  Defendant has also failed to show that no other sources of evidence exist.  Instead,

he cites prejudice from the "enormous task" of locating that evidence.  In sum, defendant falls

far short of clearing the monumental hurdle that is before him.

        Having held that defendant has failed to establish actual and substantial prejudice, it

is unnecessary to reach into the next stage of the pre-indictment delay analysis – the

government's reasons for the delay.  Still, we note that the government's explanation is

conclusory, vague and speculative.  According to the government, it was under the impression

that most of the financial records were destroyed, but in late 2001 it learned that those records

actually existed.  This explanation, which is not supported by an affidavit, only shows that the government lacked some evidence, not that it was ignorant of all suspected wrongdoing.  The government does not contend that the evidence was so sparse that it could not prosecute the case prior to discovering the records, but, instead, that the case against defendant was bolstered by the newly-discovered records.  The government describes what the discovered records reveal regarding the organizations' expenditures, but it fails to show specifically how the absence of the records precluded prosecution.  It is unclear how these records correspond to the charges because the government does not link those records to specific charges.  Further, the government fails to argue that the charges could not be supported by evidence from other sources.  Still, despite the government's delay, and its inability to explain that delay, due process has not been violated here and this is not the rare case that must be dismissed for pre-indictment delay.

<u>Defendant's Motion to Dismiss Counts 17 Through 29 as Untimely</u>

Counts 17 through 30 charge defendant with willfully failing to pay over withholding taxes to the IRS, in violation of section 7202.  Section 7202 requires a person to withhold certain taxes[1] from an employee's paycheck and to pay over those sums to the IRS, and a failure to meet either of those obligations violates the statute.  <u>United States v. Gilbert</u>, 266 F.3d 1180, 1185 (9th Cir. 2001).  *See also* Internal Revenue Manual § 9.1.3.3.3.1 (stating that the elements of a section 7202 offense are "either a duty to collect any tax or a duty to account for and pay over any tax, or both; either failure to collect any tax or failure to truthfully

---

[1] An employer's payroll tax liability includes the following: "(i) Federal Insurance Contribution Act ("FICA") payments, which include the employee's contribution to Social Security and Medicaid; (ii) Federal Unemployment Tax Act ("FUTA") payments; and (iii) required withholdings in connection with employee income taxes." Melissa Sanchez & Adam Tejeda, *Tax Violations*, 41 AM. CRIM. L. REV. 1147, 1167 (2004). The court uses "employer" as shorthand for "person required under this title to collect, account for, and pay over" from section 7202. Defendant does not dispute that he was a person charged with those responsibilities.

account for and pay over any tax, or both; and willfulness.").

Defendant argues that the controlling limitations period for section 7202 offenses is three years, but the government contends that the period is six years.  Defendant also claims that the limitations period begins to run when payment becomes past due, but the government states that the clock starts on April 15 of the succeeding calendar year.   Under 26 U.S.C. § 6531 the limitations periods for "offenses arising under the internal revenue laws" is three years "after the commission of the offense," but, if one of eight statutory exceptions apply, the limitations period is six years.   At issue here is if one of those exceptions–section 6531(4)–applies to section 7202.  Defendant has agreed to toll the limitations period on March 31, 2003, which means that the limitations periods must have begun after either March 30, 1997, or March 30, 2000.  If section 6531(4) does not apply, then only Count 30, which relates to a tax payment due on April 30, 2001, would be within three years of the indictment.[2]  But if section 6531(4) does apply, and assuming that limitations period begins to run on the payment's due date, then only Counts 17 and 18 are untimely.[3]   We conclude that when a taxpayer fails to pay over withholding taxes the government must bring a section 7202 prosecution within six years from the date the payment was due.

---

[2] This assumes that the limitations period begins to run on the payment due date.  If April 15 of the year after the payment due date marks the start of the limitations period, then Counts 25 through 29 would also be timely.  Counts 25 through 28 relate to quarterly payments due during 1999, which means the clock starts on April 15, 2000.  And Count 29 corresponds to a January 30, 2000, due date, which sets the critical date at April 15, 2001.

[3] Payment for Count 17 was due on October 30, 1996.  Count 18 corresponds to the quarter ending December 31, 1996, and lists payment due on January 30, 1998.  Defendant calls our attention to this typographical error in Count 18, and states that the due date was actually January 30, 1997.  The government does not object, so we assume that the payment due date, and not the ending date for the quarter, is incorrectly transcribed in the indictment.  There appear to be other clerical errors in the indictment.  Count 19 states the quarter ended on March 31, 1997, but lists the tax payment due on April 30, 1998.  Similarly, Count 20 states the quarter ended on June 30, 1997, but lists the tax payment due date as July 30, 1998.  Also, Count 30 has the quarter ending on March 31, 2000, but states that the payment was due on April 30, 2001.

Section 6531(4) extends the limitations period to six years "for the offense of willfully failing to pay any tax, or make any return . . . at the time or times required by law or regulations." This subsection does not explicitly reference another tax code provision, unlike four other subsections. *See* section 6531(5) (referencing sections 7206(1) and 7207); section 6531(6) (referencing section 7212(a)); section 6531(7) (referencing section 7214(a)); section 6531(8) (referencing 18 U.S.C. § 371). But the absence of specific reference to section 7202 by name does not indicate that it is beyond the coverage of section 6531(4), as an analysis of the language of section 6531(4) demonstrates.

Defendant claims that the language of section 6531(4) shows that Congress did not intend that it cover section 7202 offenses. Defendant argues that section 6531(4) closely tracks the language of section 7203, not section 7202, which indicates that section 6531(4) covers only section 7203. *Compare* section 6531(4) ("offense of willfully failing to pay any tax, or make any return . . . at the time or times required by law or regulations"), *with* section 7203 ("[a]ny person . . . who willfully fails to pay such estimated tax or tax, make such return"). But if Congress intended for section 6531(4) to reference section 7203 exclusively, it would have mentioned section 7203 by name. It instead chose to track a phrase from section 7203, which is insufficient to establish an exclusive relationship between the sections. Relying on United States v. Block, 497 F. Supp. 629, 632 (N.D. Ga. 1980), defendant emphasizes that section 6531(4) applies only to the "offense of willfully failing to pay any tax," and therefore cannot refer to two offenses – those in sections 7202 and 7203. That argument fails because its predicate – that section 6531(4) is solely wedded to section 7203 – is wrong. Further, "offense" clearly modifies "any tax, or . . . any return," and the government's attempts to depict "offense" as plural through linguistic maneuvers such as arguing that "any tax" is actually

plural, are wholly unnecessary. Failing to pay any tax on different occasions will lead to multiple offenses, and multiple violations.

Defendant also argues that section 6531(4) does not cover section 7202 because it punishes the failure to "pay any tax," not the failure to "pay over any tax" from section 7202. Defendant also cites United States v. Brennick, 908 F. Supp. 1004, 1018-19 (D. Mass. 1995), which held that the absence of the phrase "pay over" from section 6531(4) shows that it did not cover section 7202. "Pay over" is key language to section 7202 because it describes how an employer pays over to the IRS federal income taxes withheld from an employee's salary. Yet these "third party taxes" (Block, 497 F. Supp. at 632) are still taxes, and section 6531(4) clearly applies to "any tax." We would have to ignore the plain meaning of "pay any tax" in order to exempt from its coverage withholding taxes, which, despite their method of payment, are still taxes that must be paid.

Further, case law heavily favors the longer limitations period. Block and Brennick are the only two cases to hold that the three-year limitations period applies. In contrast, five federal circuits hold that the six-year limitations period applies to section 7202. *See* United States v. Adam, 296 F.3d 327 (5th Cir. 2002); United States v. Gilbert, 266 F.3d 1180 (9th Cir. 2001); United States v. Gollapudi, 130 F.3d 66 (3d Cir. 1997); United States v. Evangelista, 122 F.3d 112 (2d Cir. 1997); United States v. Porth, 426 F.2d 519 (10th Cir. 1970). Those decisions discuss many of the persuasive arguments in favor of the longer limitations period that are detailed above and other arguments as well, such as the inconsistency of Congress applying section 6531(4) to section 7203, a misdemeanor statute, but not section 7202, a felony statute. *See* Gollapudi, 130 F.3d at 71. Thus, the plain meaning of the statutory language and the vast body of case law set the limitations period at six years for section 7202 offenses.

In order to be timely charged, any criminal activity must have occurred after March 30, 1997. Counts 17 and 18 present the unique question of when the limitations period begins for offenses under section 7202 – on the payment due date or on the date when the party from whom the taxes were withheld must file her taxes. The payment due date for Count 17 was October 30, 1997, and for Count 18 payment was due on January 31, 1997. Defendant argues that the clock starts on the payment due date, which means that neither count was timely filed. The government contends that the critical date is April 15 of the year succeeding the payment due dates, which would mean that the limitations period for Counts 17 and 18 began on April 15, 1997. Neither party offers case law that directly addresses this issue, and it appears to be one of first impression.

It is important to recognize the nature of the taxes that are at issue. An employer will typically withhold federal income taxes from an employee's paycheck, and then pay over those taxes to the government. Those payments are due after each quarter. *See* 26 C.F.R. 31.6011(a)-4 ("every person required to make a return of income tax withheld from wages pursuant to section 3402 shall make a return for the first calendar quarter in which the person is required to deduct and withhold such tax and for each subsequent calendar quarter."). The withheld sums never belong to the employer, who basically holds the taxes in trust for the government. The government accuses the defendant of not paying over the withheld taxes and instead using them to meet the operational costs of the organizations that he operated. Thus, the government does not charge defendant with failing to pay his own taxes, but rather the taxes that others owed.

The analysis begins with section 6531, as it sets the limitation periods for criminal prosecutions. The final sentence of section 6531 states: "For the purpose of determining the

periods of limitation on criminal prosecutions, the rules of 6513 shall be applicable." Section 6513(b) provides that "any tax actually deducted and withheld at the source during any calendar year under chapter 24 shall, in respect of the recipient of the income, be deemed to have been paid by him on the 15th day of the fourth month following the close of his taxable year with respect to which such tax is allowable credit under section 31." This subsection thus sets the "payment date" with respect to the employee, who is the recipient of the income, but not the employer. Further, a tax is deemed paid on April 15 by the taxpayer who includes the withholding tax deduction on his tax return form, not paid in the sense of the employer paying a tax over to the IRS. Sections 6513(c) and 6513(e) are also irrelevant. Section 6513(c)(1) provides that, with respect to FICA tax, if a return is filed before April 15 of the succeeding year, it is considered filed on April 15 of that year. Section 6513(c)(2) establishes that any remuneration or amount paid prior to April 15 is considered to be paid on April 15. Section 6513(e) provides that any payment of FUTA taxes made for a calendar year or period within that year is considered to be made on the last day for filing. These provisions do not apply when the employer withholds money from an employee but fails to pay that money over to the government. No return was filed here, so section 6513(c)(1) does not apply, and no payments were made, which makes sections 6513(c)(2) and 6513(e) irrelevant. The reasons behind section 6513's irrelevance highlight the major flaw in the government's argument for April 15 as the beginning of the limitations period. April 15 relates to the tax obligations of the employee, and not the employer. Finding no guidance in section 6513, we return to section 6531.

Section 6531 provides that an indictment must be found within three or six years "next after the commission of the offense." The limitations period thus begins when the offense was

committed. *See* <u>Pendergast v. United States</u>, 317 U.S. 412, 418 (1943) ("statutes of limitations normally begin to run when the crime is complete"). We believe that a section 7202 offense is committed and completed when the employer fails to pay over withholding taxes, and not when the employee files his taxes. The government knows, at the time a quarterly payment is due but not paid, not only that it is owed money, but also who must pay those sums. The government's date, April 15, cannot be the offense date because the employer has no obligations regarding the withholding taxes on that date. April 15 relates to the date that the employees from whom taxes were withheld must file their tax returns. As discussed below in connection with Counts 31 through 34, a taxpayer may include withholding payments on her tax form even if those payments were never paid over to the government. The indictment provides additional support for the conclusion that the payment due date is the date of the offense. The government has charged defendant with fourteen separate violations of section 7202. Each violation corresponds to quarterly payment due dates. If April 15 was truly the payment due date, then the government would have brought only five counts against defendant. Instead, the charges relate to the payment due dates, which shows that the offenses occurred on those dates. By insisting that the offense occurs on April 15, the government ignores the special circumstances that section 7202 is designed to address.

While courts have not addressed when the limitations period begins for section 7202 offenses, they have resolved the same issue with respect to section 7201, which criminalizes tax evasion. Under section 6513(a), the payment of any tax prior to the filing's due date is considered to be filed on the due date, which is April 15. The section 7201 offense does not become complete until the tax return is due, as it is not until then that a tax deficiency exists. <u>United States v. King</u>, 126 F.3d 987 (7th Cir. 1997). If the taxpayer files after April 15, the

limitations period begins when the return is actually filed. United States v. Habig, 390 U.S. 222 (1968). Thus, the taxpayer can never cause the limitations period to run prior to April 15, and if he files after that date he cannot cause the period to run before he actually filed. Further, the limitations period may begin on the date of the taxpayer's last evasive act, even if that date is after the actual date of filing. *See* United States v. Anderson, 319 F.3d 1218, 1219 (10th Cir. 2003); Sanchez & Tejeda, 41 AM. CRIM. L. REV. at 1154 ("The statute of limitations begins to run on the date the taxpayer files the fraudulent document or on the date of the last affirmative act of evasion."). In each scenario the limitations period begins when the offense is complete. The offense is usually complete when taxpayer files falsified tax forms and creates a tax deficiency, (United States v. Carlson, 235 F.3d 466, 470 (9th Cir. 2000)), which explains why the limitations period for section 7201 offenses typically begins on April 15. However, that date is not the default starting date for section 7202 offenses, which focus not on the filing of tax returns, but on the collection and payment of withholding taxes.

Also demonstrating that April 15 is irrelevant to section 7202 offenses is "the last act of evasion" principle from section 7201 cases. Tax evasion cases often involve acts of concealment and subterfuge occurring over the course of many years, and each act of evasion is part of a larger scheme. United States v. Hunerlach, 197 F.3d 1059, 1065 (11th Cir. 1999). In contrast, section 7202 offenses are discrete crimes, even when the defendant fails to pay over taxes over a number of quarters, as the government accuses defendant of doing here. Under the government's argument, defendant's last evasive act occurred on April 15. But that argument fails because it focuses on the employee's filing due date and not on defendant's conduct. United States v. Butler, 297 F.3d 505 (6th Cir. 2002), also illustrates why the quarterly payment due date rather than the filing date begins the limitations period. In Butler the

government accused the defendant of violating section 7201 by failing to pay taxes for the quarter ending December 31, 1991. The defendant argued that the indictment was untimely because it was filed on January 29, 1998. The court rejected that position and concluded that December 31 only marked the end of the quarter, and not the beginning of the limitations period. That period began to run on the date of the last affirmative act of evasion, which was January 31, 1992, the quarterly payment due date, which made the indictment timely by three days. *Id.* at 511-12. Thus, the last act necessary is the failure to pay over taxes on the payment due date.

Policy also favors starting the clock when the payments are due. From the government's perspective, an employer's payment of withholding taxes is timely if it is received prior to April 15 of the year succeeding the payment due dates. This is true even when the employer is obligated to make quarterly payments to the government. The government's position vitiates any requirement to make quarterly payments and clouds the clarity provided by set deadlines. That position also creates incentives for employers to keep the withholding taxes (and reap the benefits of possession) until April 15. The government's argument also undermines the principle that an employer holds withholding taxes in trust for the government. *See* Davis v. United States, 961 F.2d 867, 869 (9th Cir. 1992) ("Although an employer collects [withholding taxes] each salary period, payment to the federal government takes place on a quarterly basis. In the interim, the employer holds the collected taxes in trust for the government."); *see also* 26 U.S.C. § 7501(a) ("Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States."). In contrast, viewing a section 7202 offense to be

complete on the payment due date supports the policy of employer as trustee of withholding taxes, and also sets clear standards for employers obligated to pay those taxes over to the government.

The limitations period for section 7202 offenses begins to run when the tax payments were due, which renders Counts 17 and 18 untimely, as those tax payments were due more than six years prior to the indictment. Counts 19 through 30 are timely filed.

## Defendant's Motion to Sever Bank Fraud Counts from Tax Violations

The government's case against defendant spans many years and covers a wide range of conduct. We have already held that the government's pre-indictment delay was not sufficiently prejudicial to warrant dismissal of the entire indictment. Defendant challenges the second facet of the government's case when he moves to dismiss the bank fraud counts (Counts 1 through 16) from the tax counts (Counts 17 through 34). Defendant argues that the bank fraud and tax counts are improperly joined because they are not sufficiently related, and he also contends that joinder will prejudice his right to a fair trial.

The government may charge a defendant with multiple offenses provided that they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). Even if offenses are properly joined, a court has discretion to sever them if their joinder sufficiently prejudices the defendant. FED. R. CRIM. P. 14(a); United States v. Shue, 766 F.2d 1122, 1134 (7th Cir. 1985). If the Rule 8 requirements are met, then Rule 14 controls severance issues. United States v. Lane, 474 U.S. 438, 447 (1986).

Joinder of offenses increases judicial economy by avoiding duplicative trials. *See* United States v. Coleman, 22 F.3d 126, 132 (7th Cir. 1993) ("Judicial economy and convenience

are the chief virtues of joint trials– i.e. joinder often avoids expensive and duplicative trials."). The Seventh Circuit has emphasized that Rule 8 should be broadly construed to promote judicial efficiency. *See* United States v. Stokes, 211 F.3d 1039, 1042 (7th Cir. 2000); United States v. Freland, 141 F.3d 1223, 1226 (7th Cir. 1998); United States v. Alexander, 135 F.3d 470, 476 (7th Cir. 1998); United States v. Moore, 115 F.3d 1348, 1362 (7th Cir. 1992). Despite the policy favoring joinder, benefits of joint trials "must be balanced against the defendant's right to a trial free of prejudice." United States v. L'Allier, 838 F.2d 234, 240 (7th Cir. 1988); *see also* Coleman, 22 F.3d at 132. ("defendant embarrassment or confoundment in presenting separate defenses simultaneously, jury cumulation of evidence, and jury inference of criminal disposition are [joinder's] main vices."). When determining whether or not joinder is proper, the court focuses on the indictment. Alexander, 135 F.3d at 475; United States v. Hubbard, 61 F.3d 1261, 1270 (7th Cir. 1995); United States v. Bruun, 809 F.2d 397, 406 (7th Cir. 1987).

Defendant argues that joinder is improper because the indictment fails to show that the bank fraud offenses are sufficiently linked to the tax violations. Defendant contends that the indictment actually shows that the two groups of offenses are dissimilar. He states that the bank fraud offenses occurred between 1993 and 1997, but the tax violations transpired between 1996 and 2001. Defendant further emphasizes that the final bank fraud scheme terminated prior to the incorporation of IDI. Defendant also highlights that the offenses derive from distinct titles in the U.S. Code, that the victims are different, and that the offenses require proof of entirely different elements.

According to the government, joinder is proper because the bank fraud and tax counts are part of the same transaction and common scheme or plan. Specifically, the government believes that defendant used the bank fraud and tax violations to maximize the organizations'

operating income and his own influence. The government also states that the charges do share evidence, specifically defendant's bank accounts, which the government believes will show that defendant orchestrated the check-kiting schemes and also had sufficient money to meet the organizations' tax obligations. The government further contends that it will use the IPAF tax returns to establish defendant's IDI-related tax violations.

Absent from the face of the indictment is any clear connection between the bank fraud offenses and tax violations. Counts 17 through 20 incorporate only paragraph one of Count 1, which conveys the following information: defendant was the executive director at IPAF; he was in charge of the day-to-day operations; he was responsible for maintaining the books and records, including corporate receipts, bank accounts, and tax forms. Counts 31 through 34, which relate to the section 7206 violations, do not incorporate paragraph one from Count 1. Indeed, Counts 31 through 34 are silent as to the bank fraud violations and, likewise, Counts 1 through 16 do not mention the section 7206 offenses. Finding that the face of the indictment fails to link the two groups of offenses, we turn to the bases for joinder set forth in Rule 8(a).

As mentioned above, Rule 8(a) provides three possible grounds for joinder. The government contends that the bank fraud offenses and tax violations are based on the same transaction and common scheme, and it does not argue that the charges are of the "same or similar character,"[4] which is "the broadest of the possible bases for joinder under Rule 8(a)." Alexander, 135 F.3d at 476. The "transaction" basis has been interpreted broadly, and it applies when charges share a "logical relationship." United States v. Berardi, 675 F.2d 894, 899

---

[4] The government states in its brief: "The bank and tax offenses are properly joined because they stem from 'transactions,' within the meaning of Rule 8, which are 'connected together' and 'constitute parts of a common scheme or plan'" (quoting Rule 8(a)) and "All of the charges in this case arise from Creamer's common scheme to maximize the operating income and influence of himself and the entities he personally controlled through fraud."

(7th Cir. 1982). A logical relationship exists when one charge serves as a "logical precursor" for the other. United States v. Woody, 55 F.3d 1257, 1267 (7th Cir. 1995). In Woody, the defendant was charged with possessing stolen mail and assault. The court held that the stolen mail charge was a logical precursor for the assault because the assault occurred while officers attempted to arrest the defendant on the mail charges. Similarly, multiple charges comprise a "common scheme or plan," when one charge is directly related to and even provides the impetus for the other charge. *See* United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996) (observing that the "common scheme or plan" basis "is often used to join false statement claims with tax fraud charges where the tax fraud involves failure to report specific income obtained by the false statements."). The indictment does not expressly state that the charges comprise either a transaction or common scheme, but the government may still establish joinder through other means, such as the existence of an evidentiary overlap between the charges.

There is some dispute as to the role that evidence should play in the joinder analysis. Some courts have ruled that evidence has no bearing in determining whether joinder is proper. *See* United States v. Kaquatosh, 227 F. Supp. 2d 1045, 1050 n.10 (E.D. Wis. 2002 ) ("potential evidentiary overlap . . . is irrelevant under the controlling legal standard"); United States v. Lanas, 324 F.3d 894, 899 (7th Cir. 2003) ("whether there was misjoinder under Rule 8 is determined by looking solely at the allegations in the indictment; it is thus irrelevant what was shown by the proof at trial."). Other courts have held that evidence does indeed serve a role when considering joinder problems. *See* L'Allier, 838 F.2d at 240 (quoting United States v. Shue, 766 F.2d 1122, 1134 (7th Cir. 1985)) (stating that joinder is proper "if the 'counts refer to the same type of offenses occurring over a relatively short period of time, and the evidence

as to each count overlaps.'"); United States v. Donaldson, 978 F.2d 381, 391 (7th Cir. 1992) ("Offenses may be joined if . . . the evidence of several counts overlaps."). *See also* United States v. Best, 235 F. Supp. 2d 923, 928 (N.D. Ind. 2002) (recognizing that "[t]he Seventh Circuit has formulated two slightly different tests for analyzing whether the joinder of charges is proper under Rule 8."). This dispute may derive from the Seventh Circuit observation that Rule 8(a) contains "a rather clear directive to compare the offenses charged for categorical, not evidentiary, similarities." Coleman, 22 F.3d at 133. That "directive" related to the "same or similar character" language from Rule 8(a), which is not at issue in this case. The court in Coleman also contrasted the "same or similar character" language with the other two grounds for joinder, which are prefaced by the words "are based on," which implies that considering evidence is proper and relevant to the transaction and common scheme grounds. Further, establishing if crimes are connected to form a common scheme necessarily involves looking at the evidence that supports each charge. See United States v. Windom, 19 F.3d 1190, 1196 (7th Cir. 1994) (quoting United States v. Montes-Cardenas, 746 F.2d 771, 776 (11th Cir. 1984))("Two crimes are 'connected together' if the proof of one crime constitutes a substantial portion of the proof of another."). Because the government seeks joinder on the "transaction" and "common scheme" grounds, the court will consider the argument that the evidentiary overlap justifies the joinder of the bank fraud and tax charges.

The government claims that the bank records are common to all charges and are sufficient to justify joinder. But that evidence is only common to the offenses occurring in 1996 and 1997. Bank records relating to the 1993 bank fraud have no bearing on any alleged tax violations. And because Counts 17 and 18 are untimely, the bank records are only relevant to Counts 19 and 20. The evidentiary overlap is much too minimal to support joinder. Not only

does the government's evidence fail to join all counts, it also fails to explain how the bank fraud charges and tax violations are a transaction, or are connected together as a common scheme or plan. The government alleges that defendant used the check-kiting scheme to pay the organizations' operational costs, which presumably included salaries paid to IPAF employees. *See* Indictment, Count 1, ¶ 12(c) (defendant kited checks "to fraudulently cover the payment of bills and other financial obligations defendant CREAMER had authorized."). It was from those salaries that defendant withheld federal income taxes, which he then allegedly failed to pay over to the government. However, the government does not allege that there is such a direct link between the proceeds from the check-kiting scheme and tax violations. According to defendant, any such link would be impossible because the bank fraud created no proceeds. Regardless of the existence of proceeds, neither allegations nor evidence binds the two alleged schemes together and the two groups of charges are not logically related to each other.

The dearth of shared evidence suggests that severance will not lead to wasted judicial resources. A joint trial would require the jury to consider two different bodies of law. The bank fraud and tax offenses share no common elements. In contrast, in <u>Coleman</u> the court held that joinder was appropriate because the four counts against the defendant each derived from the same criminal statute, which meant that each offense shared the same elements. *See* <u>Coleman</u>, 126 F.3d at 135 ("Also, the central contested issue for each count was virtually the same—i.e. constructive possession—and, as a result, the jury did not have to grapple with the application of widely variant governing principles.").

Joinder may also be improper when the offenses are not temporally related. *See* <u>Donaldson</u>, 978 F.2d at 391 ("Offenses may be joined if they occur within a relatively short

period of time."). As many as eight years separate the earliest bank fraud offense from the final alleged tax violation. In <u>Coleman</u> the court described the temporal relation between offenses that were separated by twenty-one months to "range from moderate to quite slim." <u>Coleman</u>, 22 F.3d at 131. In <u>United States v. Turner</u>, 93 F.3d 276, 283 (7th Cir. 1996), the court observed that a fourteen-month time span between offenses indicated that those offenses were not temporally related. And, in <u>Hubbard</u>, the court described seventeen months as a "significant expanse of time" that failed to establish a temporal connection between two charges. <u>Hubbard</u>, 61 F.3d at 1270. Under those standards, an eight-year expanse certainly shows that the offenses are not temporally related, and weighs in favor of severance.

Joinder is improper because the bank fraud charges and the tax violations are independent of each other. In cases where joinder is appropriate, one charge often provides the impetus or motive for the other charge. For example, in <u>United States v. Dominguez</u>, 226 F.3d 1235 (11th Cir. 2000), the court held that drug offenses and mortgage fraud charges were properly joined because "concealing income from the drug activity was the motive for the mortgage fraud." *Id.* at 1242. In that case, when the defendant applied for a mortgage he submitted false tax returns in order to hide the fact that his income derived from illegal drug activity. The court observed that "the fact that one illegal activity provides the impetus for the other illegal activity is sufficient to constitute a common scheme for joinder purposes." *Id.* at 1239. In <u>United States v. Buchanan</u>, 930 F. Supp. 657, 667 (D. Mass. 1996) the court held that joinder was improper because there were no allegations that charges relating to one scheme served as the "predicate" for charges involving another scheme. In <u>United States v. Koen</u>, 982 F.2d 1101, 1112 (7th Cir. 1992), the defendant argued that the government improperly joined an embezzlement charge with arson and mail fraud charges. The court disagreed and held that

"the fact that [the defendant] may have committed embezzlement would be especially relevant to establishing a motive to commit later acts of mail fraud." In Berardi, the defendant was charged with extortion, mail fraud, and obstruction of justice and claimed misjoinder. The court found the charges were properly joined because evidence supporting one offense helped prove another offense. Berardi, 675 F.2d at 900. In each of the cases one charge essentially derived from another, as seen when the defendant commits illegal acts in an attempt to cover up prior illegal conduct. The government cannot point to similar links between the offenses brought against defendant.

The government does not allege that defendant failed to pay over the withholding taxes because of the bank fraud charges. Nor does it argue that the bank fraud charges were either predicate or impetus for the tax violations. Further, as mentioned above, the government does not contend that the tax violations were based on income produced by the bank fraud. *See* United States v. Anderson, 809 F.2d 1281, 1288 (7th Cir. 1987) ("Joinder of tax evasion counts is appropriate when it is based upon unreported income flowing directly from the activities which are the subject of the other counts."). Even if the bank fraud counts played a very small role in the tax violations, separate trials would be required to protect defendant's right to a fair trial. United States v. Emond, 935 F.2d 1511, 1516 (7th Cir. 1991).

The government also contends that a common scheme exists due to defendant's alleged instrumental role in both the bank fraud and tax violations during his tenure as IPAF's director. In Koen, the court noted that the offenses were of a "similar character because they all relate to [defendant's] mishandling of the funds." Koen, 982 F.2d at 1111. And in Alexander, the court concluded that joinder was proper because the defendant committed the offenses "in order to enhance the resources of his bankruptcy petition filing business."

<u>Alexander</u>, 135 F.3d at 476. These cases are distinguishable on several grounds. First, these cases focused on the "same or similar character" basis, which the government does not seek to apply here. Second, sufficient evidentiary and temporal support bolstered the government's case for joinder in those cases, whereas here there is a lack of evidentiary support and the bank fraud and tax violations are separated by as many as eight years. Under the government's approach, any criminal conduct that defendant allegedly committed that contributed to the organizations' bottom line would be part of the common scheme and subject to joinder. Thus, a bank robbery or narcotics transaction that yielded proceeds later used to pay IPAF's heating bill would be subject to joinder, even if those criminal acts occurred eight years after the bank fraud. We are to apply Rule 8 broadly, but the government's construction stretches that rule beyond its proper bounds.

Defendant also alleges that joinder would prejudice his right to a fair trial. Much of the evidence related to the alleged check-kiting schemes would be inadmissible at trial on the tax violations. The government does not contend that all evidence would be cross-admissible. The introduction of inadmissible evidence could allow the jury to convict defendant based on a perceived propensity to violate the law. *See* <u>Coleman</u>, 22 F.3d at 132 (if "evidence of the joined offenses would be inadmissible at separate trials, joinder seems to implicate the set of concerns underlying the so-called propensity rule of evidence."). Defendant has shown that joinder would prejudice his defense. Having found that Counts 1 through 16 are improperly joined with Counts 17 through 34, we need not reach defendant's argument that severance is required under Rule 14.

**Defendant's Motion to Dismiss Counts 31Through 34 For Failure to State an Offense**

In Counts 31 through 34 the government accuses defendant of submitting tax returns he knew were not correct in every material matter, in violation of 26 U.S.C. § 7206(1).[5] Specifically, the government alleges that defendant misstated the total taxes that were owed or overpaid for the years 1996 through 1999 when he included withholding taxes, thus inflating the total tax payments.

Defendant argues that Counts 31 through 34 fail to state a claim because Form 1040 only requires the taxpayer to include the taxes withheld, not the sums actually paid over to the IRS, and that the government does not accuse him of misstating the amounts withheld. Thus, according to defendant, because the actual payment of the withholding taxes is irrelevant to the veracity of his tax forms, and since he accurately stated the amounts withheld, his tax forms are literally true and do not violate section 7206(1).

In the normal course, an employer withholds income taxes from its employees; submits quarterly a form 941 disclosing the amount withheld; and deposits that amount, together with other taxes due, with the federal government. The employer annually prepares W-2 and 1099 forms, which disclose the amount withheld during that taxable year and furnishes them to each of its employees. The employee thereafter files his or her tax return, in which the employee takes credit as a payment the federal income tax withheld as set forth in the forms W-2 and 1099.

As we understand it, the government is not contending that the employer did not file

---

[5] A person violates section 7206(1) if he "Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter."

the form 941 quarterly reports or that defendant received any of the funds purportedly withheld. It charges, rather, that the employer did not make the required deposits, that defendant was responsible for making those deposits and that he claimed the amounts withheld (reflected in at least some instances in W-2 or 1099 forms, or both) as payment credits on his personal income tax returns, even though he knew the government had never received the money.

Defendant relies upon United States v. Borman, 992 F.2d 124 (7th Cir. 1993), and United States v. Reynolds, 919 F.2d 435 (7th Cir. 1990). In both cases the taxpayer or taxpayers used a form that required them to disclose only some of their income, and the disclosures as required by that form were accurate. While their failure to use the correct forms exposed them to criminal sanctions for failure to disclose their entire income or for tax evasion, they could not be prosecuted for filing a false return. The government argues, in response, that the returns here were inaccurate because defendant claimed credit for payments he knew had not been made, and which he had responsibility to make.

Again, in the normal course, a taxpayer is entitled to a credit for withholding taxes, even if those taxes were never paid to the IRS. 26 C.F.R. 1.31-1 ("If the tax has actually been withheld at the source, credit or refund shall be made to the recipient of the income even though such tax has not been paid over to the Government by the employer."); Sanchez & Tejeda, 41 AM. CRIM. L. REV. at 1167 ("Once an employer withholds taxes from an employee's wages, the IRS credits the withholdings to the employee regardless of whether the employer pays them over to the government."; Purdy Co. of Illinois v. United States, 814 F.2d 1183, 1186 (7th Cir. 1987) ("If the employer withholds these "trust fund" taxes but fails to pay them over to the United States, the employee is nevertheless credited with having paid the taxes and is

not liable for any additional payment."); <u>Weisman v. C.I.R.</u>, 103 F.Supp.2d 621 (E.D.N.Y. 2000). The policy is convincing and it benefits employees who are entitled to presume that their employers pay over the taxes withheld from their paychecks. It would be patently unfair to saddle an employee with the responsibility of verifying if her employer made quarterly tax payments.

In this case defendant was not only an employee, he allegedly held the dual status of employee and employer, and was , more importantly, the person responsible for paying over the withheld taxes to the government. Thus, according to the government, when he allegedly failed to make those payments he was no longer entitled to presume that they were paid. While that contention finds some support from <u>United States v. Gollapudi</u>, 130 F.3d 66 (3d Cir. 1997) (although there the defendant did not even file any form 941s), we think that it confuses the different capacities in which defendant allegedly acted. 26 C.F.R. 1.31-1 does not make the distinction. The failure to pay over is by the employer. The employee, without any reference to his knowledge, is entitled to the credit if the tax has been withheld.

That does not mean, however, that one with a dual status necessarily escapes sanctions. 26 U.S.C. § 7202 imposes criminal penalties on a person required to pay over the withheld taxes, who wilfully fails to do so. That charge is the subject of Counts 21 through 30 of the indictment. Count 31 relates to the 1996 tax return, for a period when defendant was allegedly the chief executive officer of IPAF, and count 32 relates partially to a period when he held that position. Counts 21 through 30 relate to the period 1997-1999, when defendant was allegedly chief executive officer of IDI, which is partially the period for Count 32 and which are mirror images of the claimed credits on the personal tax returns in Counts 33 and 34. We conclude that Counts 21 through 30 are the proper charges and that Counts 31 through 34 are not.

Counts 31 through 34 are dismissed.

<u>Discovery Related Motions</u>

Defendant presents three motions related to pretrial discovery. He requests that the court order the government to present notice of its intention to use Rule 404(b) "other crimes, wrongs, or acts" evidence no later than forty-five days before trial. Defendant moves to compel the government to present no later than forty-five days prior to trial a proffer pursuant to <u>United States v. Santiago</u>, 582 F.2d 1128 (7th Cir. 1978) ("<u>Santiago</u> proffer") in order to establish the existence of a conspiracy. He also moves for the disclosure of exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972). These motions are denied as moot because the government has indicated that it understands its obligations and has pledged to meet them.

The government states that it will provide notice of its intent to use any evidence under Rule 404(b) and also present a <u>Santiago</u> proffer no later than four weeks prior to trial. That is a reasonable amount of time and will prevent unfair surprise and allow defendant to prepare any motions he deems necessary. As to the nature of the Rule 404(b) disclosure, the Advisory Committee Notes to the 1991 Amendments specify that the "Committee opted for a generalized notice provision which requires the prosecution to apprise the defense of the general nature of the evidence of extrinsic acts." Thus, the government need only disclose the "general nature" of the evidence; however, vague disclosures that prevent defendant from filing motions *in limine* are improper and undermine the purpose of disclosure. Defendant has requested disclosure of nineteen categories of exculpatory evidence, but the government argues

that several of those categories are neither exculpatory nor impeaching.[6]  It is not necessary at this juncture to label any category of evidence beyond the reach of <u>Brady</u> and <u>Giglio</u>.[7]  The government acknowledges that it is under a continuing duty to disclose any exculpatory evidence.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion to dismiss the indictment for pre-indictment delay is denied; the motion to dismiss Counts 19 through 29 is denied, but Counts 17 and 18 are dismissed as untimely; defendant's motion to sever Counts 1 through 16 from Counts 17 through 34 is granted; defendant's motion to dismiss Counts 31 through 34 is granted; and defendant's discovery-related motions pertaining to Rule 404(b) evidence, a <u>Santiago</u> proffer, and exculpatory evidence, are denied as moot.

_James B. Moran_
JAMES B. MORAN
Senior Judge, U. S. District Court

_April 8_ , 2005.

---

[6] The government argues the following requests implicate evidence that is not <u>Brady</u> or <u>Giglio</u> material: (1) Any and all information about pre-indictment delay and (2) Request for names, addresses, and statements as to who was present when the events occurred but failed to implicate defendant is not even subject to discovery according to the government.

[7] Evidence that does not on its face appear to be exculpatory or impeaching, such as any documents relating to and explaining the delay, could very well be discoverable.  For instance, if the pre-indictment delay was caused by a witness who made statements exculpating defendant, but then changed his story, the witness's statements could be discoverable.