UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

AUG **3 1** 2005

**Judge James B. Moran**
**United States District Court**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 04 CR 281 |
| | ) | Judge MORAN |
| ROBERT B. CREAMER | ) | |

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, ROBERT B. CREAMER, and his attorneys, ANN C. TIGHE and THEODORE T. POULOS, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 04 CR 281. This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, ROBERT B. CREAMER, and his attorneys, ANN C. TIGHE and THEODORE T. POULOS, have agreed upon the following:

1.      Defendant acknowledges that he has been charged in the indictment in this case with bank fraud, in violation of Title 18, United States Code, Section 1344, and willful failure to pay

withholding taxes and subscribing false returns, in violation of Title 26, United States Code, Sections 7202 and 7206.

    2.     Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

    3.     Defendant fully understands the nature and elements of the crimes with which he has been charged.

    4.     Defendant will enter a voluntary plea of guilty to Count One and Count Twenty-One of the indictment in this case.

    5.     Defendant will plead guilty because he is in fact guilty of the charges contained in Count One and Count Twenty-One of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt and relevant sentencing facts beyond a reasonable doubt:

        (a)     ***Count One - Bank Fraud***

            (i)  With respect to Count One of the indictment, beginning no later than in or about April 1997 and continuing until at least in or about May 1997, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant CREAMER devised, intended to devise, and participated in a scheme commonly referred to as a "check-kite" to defraud Cole Taylor Bank, South Shore Bank and US Bank of Oregon in violation of Title 18, United States Code, Section 1344(1).

More specifically, defendant CREAMER was the Executive Director of Illinois Public Action Fund ("IPAF), a Chicago-based, not-for-profit entity, which also conducted business under the names Illinois Public Action, Public Action, and Illinois Citizens Action Fund. IPAF funded its

2

policy and advocacy activities through a combination of public fundraisers, personal, door-to-door and telephone solicitations of donations and memberships, and revenue generated from the sale of consumer-oriented membership products and services. A primary revenue-generating vehicle for IPAF was the telemarketed sale of credit card protection services undertaken by a sister corporation called Citizen Action Center for Consumer Rights ("CACCR"). Defendant CREAMER was the president of CACCR, which was registered to do business in the State of Illinois and headquartered in Chicago, where it shared office space and personnel with IPAF.

As Executive Director of IPAF and President of CACCR, defendant CREAMER functioned as the chief operating officer of those entities and, in that capacity, oversaw their day to day operations, management and finances, including, among other things, all corporate bank accounts and corporate tax obligations.

Dating at least as far back as 1996, IPAF and CACCR conducted their banking activities through accounts held at Cole Taylor Bank and South Shore Bank, each located in Chicago, Illinois, and U.S. Bank of Oregon, located in Portland, Oregon. All three banks were financial institutions whose deposits were insured by the Federal Deposit Insurance Corporation. Among the accounts at the three banks held and used by IPAF were (1) Cole Taylor Bank business checking account # 069092400 held in the name of "Illinois Public Action Fund, Robert B. Creamer" and (2) South Shore Bank business checking account # 4994463 held in the name of "Illinois Citizen Action Fund, [d/b/a] Illinois Public Action Fund" (the "South Shore IPAF account"). Among the accounts held and used by CACCR were: (1) South Shore Bank business checking account # 4994489 (the "South Shore CACCR account"); and (2) U.S. Bank of Oregon merchant credit card and checking account

3

# 0200205524. Defendant CREAMER was a signatory to and fully authorized to conduct transactions on all of the aforementioned accounts.

Beginning no later than April 1, 1997 and continuing to on or about May 27, 1997, defendant CREAMER used the four aforementioned accounts to conduct a check kite which operated as follows. On a daily basis, IPAF clerical employee and staff members, acting under and at the ultimate direction of defendant CREAMER; (i) obtained and reported to defendant CREAMER the stated opening balances in the accounts, as well as other accounts of IPAF and CACCR; (ii) generated and reported to defendant CREAMER reports on revenues received from door to door and telephone canvassing activities as well as newly processed sales of CACCR credit card protection plans, and (iii) compiled and reported to defendant CREAMER the operational expenses and bills of IPAF and CACCR that required prioritized payment. From this daily information defendant CREAMER (i) estimated the total of stated and actual funds available to pay for IPAF and CACCR operational expenses and (ii) decided which bills or expenses would be paid that day, whether payment of the outstanding obligation would be whole or partial, and the manner in which the obligation was to be paid. Based on the foregoing, defendant CREAMER directed one or more IPAF employees to execute and make specific interbank transfers and deposits among the aforementioned accounts, knowing that there were not sufficient funds in the accounts to pay for these transfers and deposits, thereby creating materially false and fraudulently inflated account balances for the purpose of inducing the banks to unwittingly extend IPAF and CACCR unauthorized and unsecured short-term loans.

More specifically, defendant CREAMER directed IPAF employees to effect the following circuit of interbank daily transfers through the deposit of checks or wire transfers, which, at the time

4

they were issued, he knew were insufficiently funded. Insufficiently funded checks were drawn against the artificially inflated South Shore Bank CACCR account and deposited into the South Shore IPAF account. Insufficiently funded checks were then drawn against the artificially inflated South Shore IPAF account and deposited into the Cole Taylor IPAF account. The Cole Taylor deposits generally were made through non-Cole Taylor Automated Teller Machine ("ATM") deposit transactions. Defendant CRAMER instructed IPAF employees to use non-Cole Taylor ATMs for the specific purpose of extending the processing time before which Cole Taylor would receive and request payment on the South Shore IPAF checks. Defendant CREAMER directed that a portion of the artificially inflated daily balance in the Cole Taylor IPAF account be transferred to the U.S. Bank of Oregon account, from which insufficiently funded transfers were directed to the South Shore accounts, thereby closing or completing the circuit of interbank kite transfers.

Defendant CREAMER directed the execution of checks against the remaining portion of the artificially inflated Cole Taylor IPAF account balance for payment of IPAF or CACCR operational expenses that defendant CREAMER specifically authorized on a given day. Those operational expenses included payments to third party vendors and creditors of both IPAF and CACCR and organizational payroll expenses, including defendant CREAMER's salary and the salaries of other employees. Through this daily routine of orchestrated interbank transfers for the specific purpose of artificially inflating IPAF and CACCR account balances, defendant CREAMER knowingly induced the aforementioned banks to unwittingly extend IPAF and CACCR unauthorized and unsecured short term loans.

On or about May 28, 1997, Cole Taylor Bank froze the Cole Taylor IPAF account based on its concerns about the pattern of account activity. Shortly thereafter, South Shore Bank and U.S.

5

Bank froze their respective IPAF and CACCR funds. At the time the banks froze the accounts, various checks were in transit between and among the banks, and there were approximately $370,000 in insufficiently funded outstanding checks that defendant CREAMER had caused to be executed to pay the operational expenses of IPAF and CACCR. Shortly thereafter, it was determined that Cole Taylor Bank had a negative balance of approximately $2.385 million, while the accounts at U.S. Bank and South Shore Bank had positive balances.

For the purpose of executing this check kiting scheme, on or about May 21, 1997, defendant CREAMER, at Chicago, in the Northern District of Illinois, caused to be deposited into the South Shore IPAF account a South Shore CACCR account check, numbered 1102, drawn in the amount of $936,000.00, knowing that, at the time the check was issued, the balance in the South Shore CACCR account was insufficient to cover the check, in violation of 18 U.S.C. § 1344(1).

(ii)     Defendant CREAMER further admits the following facts that he acknowledges as relevant conduct for the purposes of sentencing. In addition to the aforementioned bank accounts, from the period of approximately October through December 1996, IPAF and CACCR also conducted business through two accounts at First Bank, based in St. Paul, Minnesota, with branches in Chicago, Illinois. First Bank was a financial institution, the deposits of which were insured by the Federal Deposit Insurance Corporation. Specifically, CACCR held and maintained First Bank business checking account # 199700077761 (hereinafter "First Bank CACCR account") and IPAF held and maintained First Bank business checking account # 199700077787, which it held in the name of "Illinois Citizen Action Fund" (hereinafter "First Bank IPAF account"). Defendant CREAMER was a signatory and authorized to conduct business on both First Bank accounts.

6

Beginning no later than on or about December 3, 1996 and continuing through December 26, 1996, defendant CREAMER devised, intended to devise, and participated in a check-kiting scheme to defraud Cole Taylor Bank, US Bank of Oregon and First Bank. In executing this check kite, Defendant CREAMER employed the same methodology as outlined in Section 5(a)(i) with respect to the Count One conduct. Defendant CREAMER directed IPAF employees to execute specific interbank transfers and deposits among organizational accounts at Cole Taylor, First Bank and US Bank of Oregon, knowing that there were not sufficient funds in the accounts to pay for these transfers and deposits. Through this daily routine of orchestrated interbank transfers for the specific purpose of artificially inflating IPAF and CACCR account balances, defendant CREAMER knowingly induced the aforementioned banks to unwittingly extend IPAF and CACCR unauthorized and unsecured short term loans.

As a result of the foregoing, and at the height of this check kiting activity from December 4 through December 20, 1996, the combined actual negative daily balance in the aforementioned accounts exceeded $100,000. On or about December 20, 1996, defendant CREAMER directed the deposit of funds from outside sources to one or more of the accounts and thereby offset the existing negative balances associated with the check kite.

(iii)     Defendant CREAMER further admits the following facts that he acknowledges as relevant conduct for the purposes of sentencing. Defendant CREAMER was corporate Secretary-Treasurer and Executive Director of National Consumers Foundation ("NCF"), a sister organization of IPAF. NCF was a not for profit entity registered in the State of Illinois and conducted business from, among other places, offices in Chicago, Illinois where it shared space and personnel with IPAF. Defendant CREAMER was a corporate officer of NCF. Additionally, he functioned as its

7

chief operating officer, responsible for its day to day operations, including controlling and directing the daily administration and management of NCF's finances, which further included managing its business bank account. In 1993, IPAF and NCF conducted its business affairs in part through the following accounts held at the following banks, each of which was a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation: (i) business checking account # 100178103 held in the name of "Illinois Public Action Fund" at Bank One, NA ("Bank One") located in LaGrange, Illinois, with branch offices in, among other places, Evanston, Illinois; (ii) business checking account # 0130002860 held in the name of IPAF at HomeBanc, FSB ("HomeBanc"), located in Rockford, Illinois; (iii) business checking account # 1548503-01 held in the name of "Public Action" at Devon Bank, located in Chicago, Illinois; (iv) business checking account # 385001235436, held in the name of "National Consumers Foundation" at NBD Bank, located in Chicago and elsewhere; and (v) business checking account # 33-0178-8 held in the in the name of "National Consumers Foundation" at Mid-America National Bank, located in Chicago and elsewhere. Defendant CREAMER was a signatory and authorized to conduct business on the five aforementioned bank accounts.

Beginning no later than in or about October 1993 and continuing until in or about December 1993, defendant CREAMER devised, intended to devise, and participated in a check kiting scheme to defraud the five aforementioned banks. In executing this check kite, defendant Creamer employed the same methodology set forth in Sections 5(a)(i) & (ii) above. Defendant CREAMER directed one or more employees at IPAF to execute specific interbank transfers and deposits among organizational accounts at Bank One, Home Banc, Devon Bank, NBD Bank, and Mid-America Bank, knowing that there were not sufficient funds in the accounts to pay for these transfers and deposits. Through this

8

daily routine of orchestrated interbank transfers for the specific purpose of artificially inflating IPAF and NCF account balances, defendant CREAMER knowingly induced the aforementioned banks to unwittingly extend IPAF and NCF unauthorized and unsecured short term loans.

As a result of the foregoing check kiting activity from October to December 1993, the combined actual negative daily balance in the aforementioned accounts exceeded $100,000. In December 1993, after the banks discovered defendant CREAMER's kite and froze their respective accounts, the Devon Bank, HomeBanc, and Mid-America Bank accounts each had negative balances in excess of $100,000, while the accounts at Bank One and NBD Bank had positive balances.

(b)     ***Count Twenty-One - Failure to Pay Taxes***

With respect to Count Twenty-One of the indictment, defendant CREAMER was the president, registered agent, sole shareholder and sole employee of Issue Dynamics, Inc. ("IDI"), a registered Illinois corporation that CREAMER operated out of his residence located in Evanston, Illinois. Defendant CREAMER and IDI engaged in the provision of, among other things, political consulting services. In his capacity as President, sole shareholder and sole employee of IDI, defendant CREAMER was solely responsible for the management of the financial affairs and obligations of IDI, including all of its federal tax obligations, which involved, among other things, the filing of federal tax returns and tax withholding forms and payment of all federal income tax and tax withholding obligations. Among those federal tax obligations, defendant CREAMER was required to collect and pay over the federal income taxes, Federal Insurance Contribution Act ("FICA") taxes and Medicare withholdings relating to his earnings as an employee of IDI.

On or about January 31, 1998, defendant CREAMER, in the Northern District of Illinois, Eastern Division, defendant herein, willfully did fail to pay over to the Internal Revenue Service

9

approximately $1,892 in federal income tax withholdings, FICA taxes and Medicare withholdings

due and owing to the United States of America on wages paid to defendant CREAMER, the sole

employee of IDI during the quarter ending December 30, 1997, all in violation of Title 26, United

States Code, Section 7202. Defendant CREAMER, through his ownership and operation of IDI,

had funds available to meet the aforementioned tax obligation, but utilized the funds, at his own

discretion, to pay debts incurred in connection with his prior operation of IPAF..

      Defendant CREAMER further admits the following sentencing facts beyond a reasonable

doubt as conduct relevant to sentencing on Count Twenty-One of the indictment, specifically, that

he similarly failed to pay over to the Internal Revenue Service an additional $48,114 in federal

income tax withholdings, FICA taxes and Medicare withholdings due and owing to the United States

of America on wages paid to defendant CREAMER, the sole employee of IDI, for each of the nine

quarters beginning with the first quarter of 1998 and running continuously through the first quarter

of 2000. Defendant CREAMER, through his ownership and operation of IDI, had funds available

to meet the aforementioned tax obligation, but utilized the funds, at his own discretion, to pay debts

incurred in connection with his prior operation of Illinois Public Action Fund.

      7.     For purposes of applying the advisory guidelines promulgated by the United States

Sentencing Commission pursuant to Title 28 United States Code, Section 994, the parties agree or

disagree on the following points, as specified below:

      (a)     The applicable version of the Sentencing Guidelines is the November 1, 1997, edition

of the Guidelines Manual.

      (b)     With respect to Count One of the Indictment and the stipulated relevant conduct set

           forth in ¶ ¶ 5(a)(ii) and (iii) :

10

     (i)     The parties *agree* that pursuant to Guideline 2F1.1(a) the base offense level is 6;

     (ii)     The parties *disagree* over the amount the base offense level is increased for loss or intended loss amount under Guideline 2F1.1(b)(1). The government's position is that an upward adjustment of 13 levels is appropriate under Guideline 2F1.1(b)(1)(N) because the loss or intended loss of the Count One offense plus relevant conduct is greater than $2.5 million and less than $5 million. Defendant reserves the right to argue for a lower adjustment under Guideline 2F1.1(b)(1).

     (iii)     The parties *agree* that a 2 level adjustment to the base offense level pursuant to Guideline 2F1.1(b)(2) is appropriate in that the offense involved more than minimal planning and involved more than one victim.

     (iv)     The parties *disagree* over the application of Guideline 3B1.1 governing aggravating role in the offense. The government's position is that a 4 level adjustment pursuant to Guideline 3B1.1(a) is appropriate on the grounds that defendant was an organizer and leader of criminal activity that involved five or more participants and, alternatively, that the defendant was an organizer or leader of criminal activity that was otherwise extensive. The defendant's position is that Guideline 3B1.1 does not apply.

     (c)     With respect to Count Twenty-One of the Indictment and the stipulated relevant conduct set forth in ¶ 5(b), the parties *agree*:

(i)     The base offense level is 13 pursuant to Guidelines 2T1.6(a) and 2T4.1(H),

because the total aggregate tax loss for the count of conviction plus relevant

conduct is $50,006, which is greater than $40,000 but less than $70,000..

(d)     The parties *disagree* over the application of Guideline 3D1.2 regarding the grouping

of the offenses of conviction. It is the government's position that the Count One and Count Twenty-

One offenses are not grouped under Guidelines 3D1.2. Defendant reserves the right to argue that

Counts One and Twenty-One should be grouped.

(e)     Defendant has clearly demonstrated a recognition and affirmative acceptance of

personal responsibility for his criminal conduct. If the government does not receive additional

evidence in conflict with this provision, and if the defendant continues to accept responsibility for

his actions, within the meaning of Guideline 3El.l, a two-level reduction in the offense level is

appropriate.

(f)     Defendant has timely notified the government of his intention to enter a plea of guilty,

thereby permitting the government to avoid preparing for trial and permitting the court to allocate

its resources efficiently within the meaning of Guideline 3 E1.1(b); an additional one-point reduction

in the offense level is therefore appropriate, provided the court determines the offense level to be 16

or greater prior to the operation of Guideline 3E1.1(a).

(g)     The parties presently are not aware of any criminal history to which the Sentencing

Guidelines apply. Based on the facts as presently understood, the defendant has zero Criminal

History points and he is a Criminal History Category I.

(h)     The defendant and his attorney and the government acknowledge that the above

calculations are preliminary in nature and based on facts known to the government as of the time of

12

this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

8.      Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and the defendant shall not have a right to withdraw his plea on the basis of such corrections.

9.      Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines and take them into account in determining a reasonable sentence.

10.    Defendant understands the counts to which he will plead guilty carry the following penalties:

(a)    Count One carries a maximum penalty of 30 years imprisonment and a maximum fine of $ 1,000,000 and any restitution ordered by the Court.

(b)    Count Twenty-One carries a maximum penalty of 5 years imprisonment and a maximum fine of $10,000, and any restitution ordered by the Court.

13

(c)    Defendant understands that these counts also carry a term of supervised release of at least three and not more than five years with respect to Count One and at least two but not more than three years with respect to Count Twenty-One, which the court may specify.

Therefore, the total potential sentence carried under the counts to which defendant will plead guilty is 35 years imprisonment and a $1,010,000 fine, a term of supervised release, as well as any restitution ordered by the Court.

11.    The defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, the defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed. The defendant agrees to pay the special assessment of $200 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

12.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

(a)    If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

(b)    If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree

14

unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately.

(c)     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

(d)     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(e)     At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

13.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

14.     Nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from the defendant or defendant's partnership, or corporations. The

15

defendant understands that the amount of tax as calculated by the Internal Revenue Service may exceed the amount of tax due as calculated for the criminal case.

15.     Defendant understands that the indictment and this Plea Agreement are matters of public record and may be disclosed to any party.

16.     Defendant acknowledges that because of his conviction in this case, Title 12, United States Code, Section 1829 will prohibit him from directly or indirectly participating in the affairs of any FDIC-insured financial institution except with the prior written consent of the FDIC and, during the ten years following his conviction, the additional approval of this court. Defendant further acknowledges that if he violates this prohibition, he may be punished by imprisonment for not more than five years and a fine of not more than $1,000,000.

17.     The United States agrees not to seek additional criminal charges against the defendant for the events between 1993 and 2000 referenced in this plea agreement, which occurred in the Northern District of Illinois.

18.     The United States further agrees to dismiss its appeal respecting Counts Seventeen and Eighteen of the Indictment presently pending before the Seventh Circuit in *United States v. Creamer*, 05-2386 (7th Cir.). Following dismissal of the appeal, Defendant agrees to join in a motion to the district court to vacate the portion of the district court's April 8, 2005 ruling dismissing Counts Seventeen and Eighteen of the Indictment as untimely. In the event the district court declines to grant the joint motion to vacate, Defendant agrees to waive any objection to reinstatement of the appeal.

19.     Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's

16

conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

20.     At the time of sentencing, the government shall be free to recommend that the Court impose a sentence anywhere within the applicable guideline range. The defendant shall be free to recommend any sentence he deems appropriate.

21.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and, subject to the limitations of the sentencing guidelines, may impose the maximum penalties as set forth in paragraph 10 above. The defendant further acknowledges that if the court does not accept the sentencing recommendation of the parties, the defendant will have no right to withdraw his guilty plea.

22.     Regarding restitution, the parties agree that defendant Creamer has previously satisfied his legal restitution obligations.

23.     After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment.

24.     Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the

17

applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosections.

25.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

29.     Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

31.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE:  _August 31, 2005_


_____
PATRICK J. FITZGERALD
United States Attorney


_____
ROBERT B. CREAMER
Defendant


_____
JOSEPH FERGUSON
Assistant United States Attorney


_____
ANN C. TIGHE
Attorney for Defendant


_____
THEODORE T. POULOS
Attorney for Defendant


18