UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 CR 281 |
| | ) | |
| v. | ) | Honorable James B. Moran |
| | ) | |
| ROBERT B. CREAMER | ) | |
| | ) | |
| Defendant. | ) | |

**ROBERT CREAMER'S POSITION PAPER ON SENTENCING**

Defendant ROBERT B. CREAMER, by and through his attorneys, COTSIRILOS, TIGHE, & STREICKER, LTD., respectfully submits the following Position Paper on Sentencing.


Ann C. Tighe
Theodore T. Poulos
Tyson K. Harper
COTSIRILOS, TIGHE & STREICKER
33 North Dearborn Street - Suite 600
Chicago, IL 60602
(312) 263-0345
Attorneys for Robert Creamer


DATED:      March 21, 2006

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 4

II.  MR. CREAMER'S PERSONAL BACKGROUND AND CHARACTER ........................... 5

    A.  Childhood and Education ................................................................................. 5

    B.  Mr. Creamer's Public Interest Career at Public Action ...................................... 8

    C.  Mr. Creamer's Additional Public Interest Endeavors ....................................... 11

    D.  Robert Creamer's Devotion to Family and Friends .......................................... 14

    E.  Mr. Creamer's Selfless Character ................................................................... 15

III.  OFFENSE CONDUCT ............................................................................................ 17

    A.  Public Action's Financial Shortfalls and Fundraising Efforts ........................... 18

    B.  Check Kiting Conduct .................................................................................... 19

        1.  The 1993 Check Kiting Activity ................................................................ 19

        2.  The 1996 and 1997 Check Kiting Activity ................................................. 20

            a.  The Credit Card Protection Membership Program ................................. 20

            b.  Delayed Depositing Of Credit Card Sales ............................................ 21

            c.  The 1996 Float .................................................................................. 22

            d.  The 1997 Float .................................................................................. 22

    C.  Failure to Pay Withholding Tax ..................................................................... 24

    D.  The Context of Mr. Creamer's Offense Conduct ............................................. 25

IV.  SENTENCING RECOMMENDATION ...................................................................... 28

    A.  Summary of Guideline Calculations ................................................................ 28

    B.  Calculation of "Actual Loss" for the 1997 Check Kite ..................................... 30

        1.  Legal Standard ....................................................................................... 30

2.    The Actual Loss for 1997 Is Zero ................................................................ 32

C.    Motions for Downward Departure ................................................................ 36

1.    The Loss Amount Overstates the Seriousness of the Offense ..................... 36

a.    1993 Loss Overstates the Seriousness of the Offense ............................. 36

b.    1997 Loss Overstates the Seriousness of the Offense ............................. 38

2.    Economic Reality: The Risk to the Banks Was Minimal Because Public Action Possessed Sufficient Receivables to Cover the Float ........................................... 39

3.    Disproportion of Loss Calculation to Mr. Creamer's (Nonexistent) Gain ................... 41

4.    Extraordinary Acceptance of Responsibility ................................................ 42

5.    Lesser Harms ............................................................................................. 43

6.    Mr. Creamer Did Not Intend to Evade Taxes or to Permanently Deprive the IRS ...... 44

7.    Pre-Indictment Delay ................................................................................. 45

D.    Sentencing Considerations in Light of *United States v. Booker* ....................................... 47

## I.  **INTRODUCTION**

Robert Creamer is an extraordinary individual.  He has devoted his life to empowering the underprivileged and underserved with unwavering optimism and extraordinary generosity.  By all accounts, Robert Creamer is a remarkably selfless, energetic, and passionate advocate for the public interest.  Throughout his long career in public service, Bob Creamer has been a pillar of support and leadership for the progressive community in Illinois and nationwide, and he has inspired generations of citizens, organizers, and public officials to engage in the political process.  Moreover, Mr. Creamer, at all times, eschewed the pursuit of personal wealth, deciding instead to utilize his extraordinary vision and experience to improve the lives and opportunities of countless Americans.

Mr. Creamer's compassion and generosity are not limited to the realm of public-interest advocacy.  In fact, Mr. Creamer's true character is perhaps best expressed in his close, loving relationships with his friends and family, and in the small acts of kindness and respect that Mr. Creamer performs every day.  As one friend and colleague succinctly explains, "[Bob Creamer's] priority is to help people … and to ensure government is responsive to those most in need.  He does this by fighting for social justice in public policy advocacy, as well as in small personal gestures that confirm the goodness of the man."  (David Andrus Letter at 1).[1]

Not surprisingly, Robert Creamer's lifetime commitment to the cause of social and economic justice has spawned a legion of admirers and supporters.  Indeed, this prosecution has brought forth an unprecedented outpouring of support.  Literally hundreds of individuals have

---

[1] Each of the letters cited in this memorandum are included in Character Letters Appendix A, which was previously provided to the Court by United States Probation Officer Sheila Lally.  We commend this appendix of letters to the Court as a sample of the outstanding reference letters submitted on Mr. Creamer's behalf.  Additional letters have been submitted in Character Letters Appendix B, which was also provided to the Court by the probation office.

submitted letters to the Court attesting to Mr. Creamer's exemplary life and character, while urging and imploring the Court to exercise compassion and mercy in its sentencing decision.

On August 31, 2005, Mr. Creamer entered a plea of guilty to one count of check kiting and one count of failure to pay withholding taxes. His sentencing is scheduled for April 5, 2006. Bob Creamer has fully acknowledged his conduct and publicly apologized for his grave error in judgment. Giving full consideration to the circumstances of Mr. Creamer's case, the Sentencing Guidelines, the sentencing factors set forth in 18 U.S.C. § 3553(a), the lengthy period of investigation and punishment already exacted, and Mr. Creamer's unique and exemplary accomplishments in pursuit of social, racial, and economic justice, we respectfully submit that a sentence of incarceration is not warranted. Instead, we respectfully request that the Court sentence Mr. Creamer to a term of supervised release with any period of home confinement and/or conditions of community service that the Court deems appropriate.

## II.    MR. CREAMER'S PERSONAL BACKGROUND AND CHARACTER

### A.  Childhood and Education

Bob Creamer was born in Tulsa, Oklahoma in 1947, and moved to Shreveport, Louisiana at age ten following the divorce of his parents. (Def. Version at 2).[2] His childhood was generally happy – thanks to the efforts of his mother and maternal grandparents – and Mr. Creamer excelled in school and became involved in numerous extracurricular activities, including student council and the Presbyterian Church. (*Id.*).

Although Mr. Creamer excelled individually as a young man, even from an early age he felt tremendous unease about the inequities that he perceived in his community. In particular,

---

[2] On November 30, 2005, Mr. Creamer submitted his Version of the Offense in a letter to the United States Probation Office, and his Version of the Offense is attached hereto as Exhibit 1. Citations to Mr. Creamer's Version of the Offense in this memorandum are denoted as "Def. Version at __."

Mr. Creamer became increasingly disturbed by the overt racism and segregation that existed in Shreveport in the late fifties and early 1960's. Mr. Creamer found that his social and religious beliefs could not be reconciled with the racial inequality with which he was surrounded. (*Id.* at 2-3).

Thus, while in his teens, Bob Creamer made a speech during a chapel service advocating the end of racial segregation at his all-white public school – much to the surprise of his classmates, teachers, and even his mother. (*Id.* at 3). Jill Whitesides, a childhood friend of Mr. Creamer's, recalls in her letter to the Court Mr. Creamer's nascent social activism:

> "[Bob possessed] a wonderful combination of intellectual curiosity fueled by enthusiasm that was passionate, yet at the same time seemed very innocent…. [A]s long as I've known him, Bob has seemed lit by an inner glow of possibility, as though he was intimately acquainted with some more wonderful way of living together and he was eager to get on with initiating it."

(Jill Whitesides Letter at 1).

Mr. Creamer's concern regarding social and racial inequalities further developed throughout high school and college. He continued his involvement in student politics, and ultimately became one of the leaders of Duke University's growing progressive community. Mr. Creamer organized unique initiatives to bridge the racial divide in both Louisiana and North Carolina. In Shreveport, Mr. Creamer united with several African-American ministers to organize a series of racially integrated protests in a successful effort to obtain funding for the Head Start program, which served underprivileged children. (Def. Version at 3). Bob Creamer further launched a program of racially integrated discussion groups throughout Shreveport, which provided a unique forum for young people of all racial backgrounds to discuss current events, organize voter registration drives, and confer about political strategies and campaigns. (*Id.*; Jill Whitesides Letter at 1-2; Pamela George, Ph.D. Letter at 1). In Durham, North

Carolina, Mr. Creamer was also an instrumental leader of the "Duke Vigil," a week-long political sit-in that Mr. Creamer helped organize in the wake of Martin Luther King's tragic assassination in 1968. (Def. Version at 4; Marc Caplan Letter at 1). The vigil succeeded in increasing the wages for minority employees at Duke, legitimizing a union to represent university employees, and pressuring the President of the university to withdraw from a segregated country club. (*Id.*).

Following his graduation from Duke, Mr. Creamer continued his education at the University of Chicago's Divinity School, where he enrolled in 1969. Mr. Creamer soon concluded, however, that his energy and passion would be better employed as a public-interest organizer, rather than as the minister of a traditional church parish. Accordingly, Bob Creamer transferred to the University of Chicago's Ethics & Society program and became active in Chicago's progressive community. In particular, Mr. Creamer helped managed the Campaign Against Pollution ("CAP"), an organization founded by Saul Alinsky to successfully unite black and white Chicagoans to fight the common problem of worsening air pollution in the city. Thanks to the efforts of CAP and Mr. Creamer, Commonwealth Edison agreed to reduce its emissions of sulfur dioxide – the chief ingredient of smog – by over sixty-five percent. Following this early success, CAP expanded its mission beyond pollution to other progressive causes, and Mr. Creamer rose to the position of Associate Director.

Through his participation and leadership at CAP, Mr. Creamer found his true calling; he decided to devote his career – and his life – to progressive public-interest advocacy. Mr. Creamer withdrew from his graduate studies, and formulated an ambitious plan to create a statewide organization to promote a progressive agenda. Mr. Creamer pursued his dream of creating a dynamic, influential megaphone for society's powerless, a dream which culminated in

the founding of Public Action.

###### B.  Mr. Creamer's Public Interest Career at Public Action

Robert Creamer founded Public Action[3] in 1974, and served as its President and Director for twenty-three years until 1997.  Under his guidance, the organization flourished to become the largest public-interest organization in Illinois.  In this state alone, Public Action had over 235,000 individual members.  Moreover, in 1979, Mr. Creamer joined with his colleagues in four other states to coordinate their various efforts, resulting in the foundation of a national parent organization known as Citizen Action.  Nationwide, Citizen Action's members numbered nearly 3 million strong.

Public Action engaged in advocacy, research, and lobbying with the goal of promoting a diverse agenda of public interest and consumer issues, including: health care reform; insurance and utility cost reduction; campaign finance reform; preserving Medicare and Medicaid; preventing pollution of food and water sources by toxic chemicals; telecommunications reform; and tax reform.  The organization sought to promote progressive change through a variety of avenues, such as door-to-door canvassing, grassroots organizing, direct mail, phone campaigns, television and radio advertising, press briefings, and testimony at legislative hearings.

Under Bob Creamer's leadership, Public Action achieved remarkable success.  Public Action's efforts resulted in numerous legislative victories on progressive and consumer-oriented issues, such as:

- Utility Costs: Public Action battled utility companies for lower rates and a ban on winter shut-offs. Public Action helped pass the bill that created the Citizens'

---

[3] Illinois Public Action Council adopted a number of name changes between 1974 and 1997, including Illinois Public Action Fund and Citizen Action of Illinois.  For ease of reference, the organization will be referred to as "Public Action" throughout this memorandum, unless specifically noted otherwise.

Utility Board, and also advocated to save consumers hundreds of millions of dollars in reduced rates before the Illinois Commerce Commission;

- Prescription Drug Costs: Public Action led the fight to allow the sale of generic drugs and to reduce the cost of prescription drugs for seniors;

- Property Taxes: Public Action led the fight that created homestead exemptions for property taxpayers and provided a rebate to low-income seniors whose property taxes exceeded a fixed percentage of income;

- Public Transportation: Public Action helped lead the campaign to get the CTA to renovate – rather than demolish – the Green Line rapid transit;

- Access to Courts: Public Action coordinated Citizen Action's national program to prevent massive changes in the tort laws in the mid-1990s that would have eviscerated product liability and medical malpractice laws and would have denied recourse to the courts for average people who were victims of medical malpractice or corporate negligence;

- Insurance Reform: Public Action organized the successful campaign to strengthen regulation and require more disclosure for the insurance industry in the late 1980s;

- Environmental Regulation: Public Action helped to coordinate the national campaign to pass Super Fund toxic clean-up legislation in the 1980s, advocated for the Community 'Right to Know' Provisions that have been the basis for disclosure of toxic hazards ever since, and passed state legislation to substantially increase penalties for toxic polluters; and

- Fair Housing Practices: Public Action successfully pressed for federal (HUD) investigation of kickback schemes in the real estate settlement industry (early 1990s) that inflated settlement costs for consumers.

(Def. Version at 7; Ex. 2 hereto, Public Action Legislative Victories). In fact, a summary list of Public Action's legislative accomplishments – on behalf of utility consumers, the elderly, property taxpayers, farmers, etc. – consumes nearly nine single-spaced pages. (Ex. 2, Public Action Legislative Victories). Moreover, in the course of their grassroots advocacy and organizing work, Mr. Creamer and Public Action energized thousands of individuals to engage in important issues affecting their communities.

Through his work at Public Action, Mr. Creamer has improved the lives of tens of thousands of people in his community and across the country. According to those who know him best, "Bob is a real fighter for the underdog, someone who is willing to make supreme personal sacrifices to get the job done on behalf of others who need a voice raised in their behalf." (Gene Karpinski Letter at 1). For example, in 1983 Mr. Creamer helped to organize the "Crisis March to Springfield." Mr. Creamer coordinated this 200-mile, two-week march to the Illinois state capitol in order to protest proposed budget cuts that would have had a devastating impact on public services for the poor, including health care, education, and mental health services. (Lowell Sachnoff Letter at 1; Def. Version at 7-8). Importantly, Mr. Creamer ensured that the potential victims of the budget cuts – such as welfare mothers and union members – personally participated in the march. (Def. Version at 8). Thanks to Bob Creamer's leadership, and the support of thousands of ordinary citizens, the march "succeeded in defeating the proposed tax cuts and resulted in a fairer and more progressive tax code." (Lowell Sachnoff Letter at 1). Extraordinary efforts such as this led one longtime colleague to comment, "I don't know anyone who has worked harder and sacrificed more on behalf of middle and lower income working people than Bob Creamer." (Alan Libbra Letter at 1).

Mr. Creamer's efforts on behalf of consumers have been similarly noteworthy. Mr. Creamer and Public Action have saved working families millions of dollars in reduced utility rates, protected senior citizens from inequitable property taxes, and helped consumers avoid deceptive practices in the marketplace. (Jerome Lamet Letter at 1-2). According to the former Assistant Regional Director of the Federal Trade Commission, Mr. Creamer was "an outstanding consumer advocate. In fact, had it not been for Mr. Creamer and his organization, consumers in

the state of Illinois would have [had] no real organization to advocate their interest … and would not [have] always [gotten] a fair shake in the marketplace." (*Id.* at 1).

Beyond these concrete success stories, perhaps Mr. Creamer's most critical role has been as a pioneer and teacher in the ongoing effort to spread innovative grassroots organizing techniques, advocacy skills, and progressive ideals throughout the United States. "Year after year, Bob devoted high energy to the process and helped form a cornerstone of public interest organizing, which has been copied over and over again by other groups." (Mike Cherry Letter at 1). Letter after letter to the Court describes how Mr. Creamer's advice and experience have proven crucial to the success of organizations and political candidates devoted to progressive change and social justice. (*E.g.*, Hedy Ratner Letter at 1 ("[Bob Creamer] has influenced so many elected officials for the public good, helped to elect good and progressive candidates, and especially and most admirably [has had] enormous impact on young people to understand and care about public policy.")). Furthermore, Mr. Creamer's passion for his work has inspired thousands of individuals to become socially and politically active, thereby creating immeasurable benefits in terms of community activism and political participation. (Alan Libbra Letter at 2 ("No matter how limited their resources and time, no matter how powerless they felt, Bob Creamer literally breathed the will into these average citizens to organize and act.")). Ultimately, "the results of [Mr. Creamer's] work are not just a better environment, a higher quality of life for senior citizens, children being given a better chance in life, and people staying warm in the winter – but it also results in activated citizens." (Gregory Galluzo Letter at 1).

## C.  Mr. Creamer's Additional Public Interest Endeavors

Although Bob Creamer devoted the majority of his professional life to building Public Action, his pursuit of social and economic justice is certainly not limited to his time with that

organization. Since resigning from Public Action in June 1997, Mr. Creamer has continued his life's work by rebuilding his career as a consultant to progressive organizations and political candidates. Through his consulting firm, Strategic Consulting Group ("SCG"), Mr. Creamer continues to involve average people in political campaigns through grassroots organizing. (Def. Version at 1).

Mr. Creamer has also continued in his role as a teacher and adviser to engage young adults in the political process. In particular, he established the Campaign Management Program, which was initially developed during Jan Schakowsky's first campaign for Congress in 1998. Through this program, Mr. Creamer recruits young people who are interested in careers in political organizing. Participants receive training from some of the best political organizers in America while they develop field operations for political campaigns that mobilize thousands of volunteers and tens of thousands of voters. From 1998 to 2005, these programs recruited and trained over 800 young adults. (Def. Version at 1-2).

More recently, Mr. Creamer has led a coalition of Democratic and progressive organizations in the campaign to oppose the privatization of social security and to combat proposed cuts in the federal budget that would disproportionately harm poor families by eliminating crucial services and educational programs. (Jan Schakowsky Letter at 2). Up until the present day, Bob Creamer spends nearly every waking moment focused on how he can serve the public interest – the interest of average working citizens, consumers, the elderly, and the underprivileged. Clearly, Mr. Creamer "has never given up hope that progress is possible and has remained firmly committed to building a more just society." (Henry Bayer Letter at 1).

In addition to his work with SCG and Public Action, Robert Creamer has always generously contributed his time and talents to those in need of aid, and he has done so without

any thought of personal compensation. For example, in the late 1990's a leader of Evanston's immigrant Caribbean and African population informed Mr. Creamer that this immigrant community was receiving miserable – and often insulting – treatment by the local office of the Immigration and Naturalization Service ("INS"). (Lionel Jean Baptiste Letter at 1). The INS did not provide appointments for individuals in need of assistance, forcing many to wait in line for hours, often in freezing temperatures, simply to talk with INS agents who were frequently unresponsive and discourteous. (*Id.*). When Mr. Creamer learned of this situation, he helped formulate a plan to address these grievances, and, with the help of Congresswoman Schakowsky, ultimately succeeded in reforming the practices of the INS to eliminate unnecessary obstacles, inconvenience, and disrespect to an underserved community. (*Id.*). Bob Creamer similarly donated his time and efforts to help formulate a nationwide organizing strategy for the Center for International Policy, regardless of the fact that "he was about the only person in the room who was not being paid to work on the issue." (William Goodfellow Letter at 1-2).

Following the tragic events of September 11, 2001, Mr. Creamer again felt compelled to get involved. When Mr. Creamer learned that "innocent Muslim victims were being attacked and killed in a backlash against all Muslims," he helped to conceive and organize a solidarity march in Rogers Park. (Jack Cutrone Letter at 1). This march "publicize[d] that our enemies were not all the followers of Islam, but rather only those who chose terror and violence as a means to some distorted political end." (*Id.*). In keeping with Mr. Creamer's generous nature, he undertook this project "selflessly, not because [it] serve[d] his needs or wants, but because [it] serve[d] the greater good." (*Id.*).

These are but a few examples of how Mr. Creamer has made helping others not just a career, but the focus of his entire life. Indeed, among his colleagues and friends "it is widely

known that Bob always has a minute to lend advice to anyone fighting 'the good fight.' He works as tirelessly as anyone I have ever known…. I have never once heard him utter the words, 'I don't have time to help.'" (Lauren Beth Gash Letter at 1).

### D.  Robert Creamer's Devotion to Family and Friends

Mr. Creamer's selfless devotion to social justice in his professional life is mirrored in his caring personal relationships with family and friends. Michael Zink, who lived with Mr. Creamer and Jan Schakowsky while attending Northwestern University, describes Mr. Creamer as "a man more devoted to his family than almost anyone I have ever met." (Michael Zink Letter at 1). Despite his demanding work schedule, Mr. Creamer always makes time for his friends and family. In their letters to the Court, Bob Creamer's friends recount how he has been generous with his time, provided patient mentoring for their careers and personal lives, and offered optimistic encouragement during times of difficulty. (*E.g.*, Pamela Gilbert Letter at 2 ("[H]e was generous with his time…. He helped to lift my self-esteem and make me a more effective advocate."); Miles Rapoport Letter at 1 ("He cared about me as a person…. He committed himself to making sure I understood what lessons I could take, making sure I didn't become discouraged or disheartened."); Michael Zink Letter at 1 ("Bob [] treated me as if I were a member of his family. He always took time to speak with me about my classes in law school, about my work as an attorney, and about politics…. Bob always made me feel as if I were at a home away from home.").

Mr. Creamer's tremendous sense of empathy has made him a constant source of support for those around him. His daughter, Lauren, recalls that during difficult periods in her life, her father "brought me up onto his lap and held me and just let me cry and let me know that I was loved. This is what my Dad knows how to do so well: listen without judgment, acknowledge the

situation for what it is and be there to support people the best way that he knows how." (Lauren Creamer McLaughlin Letter at 1). Longtime friend Jackie Kendall similarly describes Bob Creamer's crucial support and positive attitude that helped her to persevere through months of cancer treatment. (Jacquelyn Kendall Letter at 1). Mr. Creamer also helped to mend the estranged relationship between his brother and father with his time and advice, and provided a warm and caring home for his widowed father-in-law, Irv Danoff, until his passing in 1997. (Stephen Creamer Letter at 1; Nancy Kohn Letter at 1). To this day, Mr. Creamer makes special efforts to visit and care for his disabled elderly mother following a stroke. (Jacob Fisher Letter at 1). There can be no doubt that, at his core, Robert Creamer is a "good man" who is committed to "making the world a better place for all of [his] children and grandchildren," in ways both great and small. (Jan Schakowsky Letter at 3).

      **E.  Mr. Creamer's Selfless Character**

      In both his professional and personal life, the common thread of Mr. Creamer's character is selflessness and personal sacrifice. In short, Bob Creamer has always placed the needs of others above his own needs. Tellingly, after thirty years of public interest work, and at the age of 58, Mr. Creamer has never earned enough to accumulate any personal assets. He has no IRA account, no 401(k), and no pension. He has zero funds saved for retirement and a net worth that is less than zero.

      Among his friends and colleagues, Mr. Creamer is well-known for his frugality and modest lifestyle. In order to preserve every cent for use in advocacy campaigns, "Bob drove a rusting, broken down car, wore threadbare suits, and ate at buffet style restaurants." (John Hennelly Letter at 1). Mr. Creamer stood out among his peers "because of his willingness to work long hours for little pay and his passion for correcting injustices." (Robert Brandon Letter

at 1). His work often necessitated travel, and in order to save money Mr. Creamer stayed at inexpensive motels and drove the least costly rental cars. (Dave Andrus Letter at 1). Moreover, on multiple occasions Mr. Creamer delayed and even forfeited his own salary in the interest of preserving organization resources. (Ex. 21 to Defendant's Sentencing Memorandum (hereinafter "Def. Memo") (previously submitted to Probation Officer and attached to PSR)).

Although Mr. Creamer received a reasonable salary from Public Action and SCG, his motivation has never been financial in nature. "The kind of work Bob has chosen to do in his career is very, very tough. The pay is not very good, the hours are terribly long, and the stress is extremely high." (Mike Lux Letter at 1). Indeed, Mr. Creamer has rejected more lucrative work that does not mesh with his personal values:

> While most political consultants take on corporate clients to enrich themselves, Bob adamantly refused to do so. In spite of my pleas and the burden of his debts, Bob insisted that SCG have liberal, Democratic views. That is no road to riches. But for Bob it wasn't about riches, it was about meaningful work.

(John Hennelly Letter at 1). There can be no doubt that "he has never been interested in being rich or accumulating possessions." (Steve Blutza Letter at 1). Rather, Bob Creamer "approaches [his] work with a deep dedication to social justice and economic improvement for the great majority of people, at his own personal sacrifice." (Heather Booth Letter at 1).

Mr. Creamer's offense conduct in the present case was similarly based on selfless motivations, rather than any desire for personal gain. Mr. Creamer engaged in the conduct underlying his conviction for the sole purpose of financially supporting Public Action, and he never intended to cause any loss. "Bob's check kiting, while certainly not excusable, was not motivated by any personal gain…. Ironically, Bob took those personal risks to protect those people most at risk from abuse by powerful business and political forces." (Lowell Sachnoff

Letter at 2).  *See also* Mike Lux Letter at 1 ("Bob's entire motivations in the actions that led to this case were to keep a non-profit group he deeply believed in alive so that it could keep fighting for the good causes he believed in.").  In the end, Mr. Creamer repaid every cent stemming from his conduct – as he always intended to do.  Mr. Creamer explains his motivations in his Version of the Offense:

> Had Public Action been a profit making business, we would have simply cut back our expenses to meet our revenue.  But Public Action ran issue campaigns.  Making money was not a goal in itself; it was only instrumental to the public interest goals we sought to achieve.  We fought against major corporations that had what seemed like unlimited resources. We did battle to end any number of injustices to low income and average citizens. Throughout my 23 years at Public Action I did everything I could to win our battles first – and try to find the resources to pay the bills second.
>
> I recognize that at times I pushed the envelope in order to achieve our mission.  I recognize now that I certainly would have been better off personally had I taken a more conservative approach.

(Def. Version at 9-10).  While there is no question that Mr. Creamer's conduct was wrong, there is also no question that Mr. Creamer sought to act in the best interests of low income and average citizens, and not in his own interest.

## III.  **OFFENSE CONDUCT**

The offense conduct is accurately set forth in paragraph five of the written Plea Agreement that was previously filed with the Court.  (Plea Agreement, ¶ 5).  Mr. Creamer deeply regrets his criminal conduct, and he has fully accepted responsibility for his actions.  (*Id.* at ¶ 7(e); Government Version of the Offense ("Govt. Version") at 37).  In a public apology following his guilty plea, Mr. Creamer expressed the remorse that he feels for his grave error in judgment:

> [I] acknowledge that my burning desire to create an organization that empowered ordinary people led me to make serious errors in judgment in

> the management of that organization's finances…. I am extremely sorry
> for that poor judgment – and for the pain it has caused my friends and
> family…. I recognize what I did was inappropriate and I accept full
> responsibility for my conduct.

(Ex. 35 to Govt. Version, Creamer Public Apology).

Although the circumstances of the case do not excuse Mr. Creamer's conduct, there are numerous unique mitigating circumstances that ought to be considered in crafting a fair, just and reasonable sentence. As discussed further, below, Mr. Creamer stands far apart from the heartland of fraud defendants, both in his history of good works and in the unusual circumstances of his criminal conduct.

### A. **Public Action's Financial Shortfalls and Fundraising Efforts**

The one constant source of difficulty throughout Bob Creamer's endeavors at Public Action was the need to raise funds to support the work of the organization. Throughout its history, Public Action was strapped for cash. Although Public Action raised millions of dollars over the years through donations from hundreds of thousands of ordinary citizens who supported Public Action's mission, the organization nonetheless was constantly short of the cash necessary to fund all of its activities.

Public Action's tenuous finances resulted from its ambitious public interest mission. Not only did Public Action initiate progressive advocacy on a wide variety of issues, but likeminded organizations also constantly requested assistance from Mr. Creamer and Public Action. Mr. Creamer always believed that he could manage to help one more organization, or one more person. Indeed, Mr. Creamer's inability to say "no" has been described as his "characteristic fault":

> Bob was always ahead of himself, [] like a runner who couldn't slow
> down… There was one more program to be funded or started than there
> was revenue for, one more promise to support yet another advocacy for

> social justice, one more idea of how to get adequate funding for the organization – *there was always one more need than there was money.*

(Harvey Lyon Letter at 1) (emphasis added).

As a result of Mr. Creamer's ambitious public-interest mission, Public Action often faced cash shortages. During these periods, Mr. Creamer did everything he could to stretch Public Action's resources, including: delaying or forfeiting his own paycheck; delaying payroll for Public Action's understanding employees; and delaying payments to Public Action's vendors. Mr. Creamer also enlisted members of Public Action's board and other well-to-do supporters to make short-term loans to the organization. And, admittedly, as a way to span the gaps in Public Action's funding, there were occasions when Mr. Creamer intentionally created "floats" in Public Action's bank accounts by engaging in check-kiting. This, in essence, allowed the organization access to unauthorized loans from its banks. It is important to note, however, that check-kiting was not the first resort. It was the last resort.

### B. Check Kiting Conduct

#### 1. The 1993 Check Kiting Activity

In 1993, Public Action was dependent upon traditional forms of fundraising, such as door-to-door and telephone canvassing, fundraising dinners, and charitable contributions from wealthy individuals. Unfortunately, those sources of funds were inconsistent, and on occasion the organization did not attain the fundraising goals that Mr. Creamer anticipated.

At the time of the check kiting activity in 1993, Mr. Creamer knew that Public Action had over $800,000 in collectible receivables, including pledges from wealthy donors, previously committed loans from individuals who supported Public Action's mission, and earned income from organizing efforts that Public Action coordinated. (Ex. 1 to Def. Memo). However, those funds were not immediately available to Public Action in December 1993 to meet the day-to-day

19

needs of the organization.

In order to address this short-term cash-flow shortage, Mr. Creamer created a float among Public Action's bank accounts by writing a circuit of checks among the various bank accounts when he knew those accounts did not have enough funds to cover each check. In late 1993, before Public Action could convert its receivables into cash, the banks discovered the float and stopped payment on Public Action checks, resulting in an overdraft in some of its accounts. Mr. Creamer contacted the banks involved and worked closely with them to cover the net overdraft, which totaled $603,916.81. This overdraft was completely cured within a few months. No bank suffered any loss.

### 2. The 1996 and 1997 Check Kiting Activity

After the December 1993 overdrafts were fully cured, Public Action continued its mission and, while it continued to struggle with its financial condition, there was no check kiting activity in 1994, 1995 and most of 1996. During this time, Mr. Creamer developed new fund raising methods with the hope of providing adequate revenue to meet the organization's needs. Yet, ironically, despite the fact that the new fund raising method was quite successful, its implementation led Mr. Creamer to again resort to check kiting.

### a. The Credit Card Protection Membership Program

In 1995, in order to generate greater funds to support Public Action's advocacy goals and activities, Public Action launched a program called the Credit Card Protection Membership project which was similar to credit card protection programs offered by CitiCorp and other major credit card companies. It was coupled with a package of consumer discounts and, of course, its proceeds supported the activities of Public Action. A sister organization was established to conduct the program – the Citizen Action Center for Consumer Rights ("CACCR").

20

The program was quite successful. Recruitment was done mainly by telemarketing firms, and it showed an enormous opportunity for profitability and growth. In 1996, its first full year of operation, this CACCR program generated over $10 million in revenue. (Ex. 6 to Defendant's Memo, CACCR 1996 Tax Return). There was, however, one major hurdle. Newly recruited members joined by giving the telemarketing representative their credit card number. As often happens with telemarketing programs, a percentage of new members would change their minds and cancel their memberships within several days. The economics of the program easily accommodated these cancellations, but U.S. Bank of Oregon, the bank that processed CACCR's credit card sales, required that CACCR, like its other credit card merchants, keep cancellations – and the periodic "chargebacks" – to a very low level.

### b. Delayed Depositing Of Credit Card Sales

To address this problem and reduce the cancellation and chargeback rates, Mr. Creamer decided in 1996 to implement a "delay program," whereby Public Action postponed processing a new member's credit card for several days or weeks after the member had authorized the credit card to be charged. Accordingly, Public Action delayed the processing of credit card sales for a period between seven and thirty days. This delay period afforded members a seven to thirty-day window to change their minds and cancel the sales before their credit cards were charged. As a result, when new members' credit cards were charged, the chargeback rates were lower.

This delay program, however, also required additional capital because the organization had to wait seven to thirty days before realizing revenues that it previously had been realizing and accessing daily. To solve this problem, Public Action entered into an agreement with a private investment firm, Access Capital, which loaned $1 million to CACCR in exchange for a

portion of CACCR's net revenues. These funds were used to finance the delay in credit card charges and to support day-to-day operations.

### c. The 1996 Float

In late 1996, before the Access Capital loan was funded, Mr. Creamer implemented a check kite in order to cover Public Action's expenses. The 1996 check kiting activity was primarily due to the implementation of the delay program, discussed above, which had caused a shortage of available funds. Thus, for a few weeks in late 1996, Mr. Creamer caused a number of checks to circulate among accounts at three banks (U.S. Bank of Oregon, Cole Taylor, and First Bank) to generate a float. Public Action's expenses were paid out of the float. At all times, Mr. Creamer was confident that the amount of the float never exceeded the amount of credit card charges being delayed for deposit. The 1996 float was ultimately cured and covered by sufficient funding, including the proceeds from the Access Capital loan. Consequently, no overdraft ever resulted at any bank from this float. Therefore, as the government concedes, (Govt. Version at 36), there is no "loss" for Guidelines purposes attributable to the 1996 kite.

### d. The 1997 Float

For the first few months after the Access Capital loan was funded, the delay program grew according to projection and an increasing number of new membership credit card charges were delayed for seven to thirty days. However, in early 1997, as a condition of continuing to process CACCR's credit card sales, U.S. Bank of Oregon required CACCR to substantially fund a reserve account that CACCR maintained at the bank. (Ex. 7 to Def. Memo, U.S. Bank Reserve Account Agreement). In March 1997, U.S. Bank required CACCR to deposit $20,000 per week into this reserve account. (Ex. 8 to Def. Memo, U.S. Bank Letters). Then, in April 1997, the bank increased these required deposits to $25,000 per week. (*Id.*). By May of 1997, CACCR

had deposited approximately $740,000 into this reserve account. (*Id.*; Ex. 9 to Def. Memo, U.S. Bank Statements).

The funding of the reserve account in the spring of 1997, coupled with the delay program described above, adversely affected the organization's cash flow. As a result, Mr. Creamer, for the last time, created an unauthorized float in Public Action's bank accounts. In the spring of 1997, Mr. Creamer was always confident that the amount of the float never exceeded the amount of undeposited credit card transactions in the delay program which the organization had in its possession and could deposit at any time to cure the float.

During the period of the float, all of the banks involved in the float were knowingly paying checks drawn on their respective accounts based on balances that included uncollected funds. In fact, banks paying on uncollected funds is the only way a float can be sustained. However, on May 28, 1997, Cole Taylor Bank notified Public Action that it would no longer honor checks drawn on uncollected funds.

When Mr. Creamer learned that Cole Taylor would no longer pay on uncollected funds, he acted to prevent any bank from suffering an overdraft by directing the staff at Public Action and CACCR to capture a large portion of the authorized credit card sales in the delay program. ***Within a matter of days, using the funds from the delay program, Mr. Creamer caused over $1.5 million to be promptly deposited into the affected bank accounts, which was more than sufficient to cure the entire float.*** (Ex. 10 to Def. Memo, Merchant Account Statements). Over the next three days, Public Action deposited an additional $246,000 dollars in sales from the delay program. (*Id.*). Thus, the float was cured entirely from the delayed credit card sales; Public Action did not have to use one cent from the $740,000 U.S. Bank reserve account.

As in 1993 and 1996, once again no bank lost any money because of Mr. Creamer's 1997 check kiting activity. Significantly, the 1997 float was cured within a matter of a few days – before all kited checks were even presented for deposit – and the float was cured from funds that were part of the normal flow of money among the kited accounts.

## C. **Failure to Pay Withholding Tax**

Following the public revelation of the 1997 check kite and Mr. Creamer's simultaneous resignation as Director of Public Action, several organizational debts remained unpaid. Three of the most significant debts were to the U.S. Post Office, to a Currency Exchange that had cashed payroll checks from Public Action, and to an individual named Suzette Harris, who had loaned money to Public Action.

Mr. Creamer personally assumed responsibility for the payment of these debts, although he had not personally guaranteed the debts of Public Action. Mr. Creamer felt a moral obligation to repay these debts, and particularly so with regard to the Suzette Harris loan. When Mr. Creamer initially accepted the loan from Ms. Harris, he incorrectly believed that she possessed sufficient wealth and financial sophistication to afford this loan, despite the relatively high-risk nature of the investment.[4] However, when Mr. Creamer learned that Ms. Harris would be left financially devastated without repayment of the loan, he determined that he would repay it personally, regardless of any legal obligation.

In order to pay off these debts of Public Action, Mr. Creamer – who has never

---

[4] The government, in its Version of the Offense, incorrectly claims that Ms. Harris "loaned money to [Public Action] based on *personal appeals* by [Mr.] Creamer." (Govt. Version at 32) (emphasis added). This is not accurate. In fact, Ms. Harris told agents from the IRS that she loaned money to Public Action based on the advice of an individual named Sherif Nasr. (Govt. Ex. 43, IRS Memorandum of Interview of Susan Harris, Sept. 27, 2002 at 1). Ms. Harris further told government agents that she did not meet Mr. Creamer until "after she loaned the money to Public Action." (*Id.* at 2).

accumulated any substantial personal assets – used the proceeds of his new consulting business, Issue Dynamics, Inc. (IDI). As a result, Mr. Creamer did not pay $50,006 of IDI's federal withholding taxes in a timely manner. In total, IDI repaid $69,915 of Public Action debts. (Ex. 17 to Def. Memo, Summary of Debt Repayments). Mr. Creamer spent an additional $36,800 of his own personal assets to repay Ms. Harris – and he continues to make payments. (*Id.*). To date, Mr. Creamer has completely repaid these debts to the U.S. Postal Service and to the Currency Exchange, and he has repaid over $100,000 to Ms. Harris. (*Id.*)

**D.  The Context of Mr. Creamer's Offense Conduct**

There is no question that Mr. Creamer's admitted conduct was not legally proper. However, it is also clear that Bob Creamer did not fully appreciate the illegal nature of his actions when he engaged in his offense conduct. As Mr. Creamer explains in his version of the offense, he operated under the "mistaken belief that if no bank actually suffers any loss, there was in fact no real foul." (Def. Version at 11). Although Mr. Creamer was interviewed by the FBI regarding a prior allegation of check kiting in 1992, nothing ever came of this interview. Moreover, Mr. Creamer was never contacted following the check floats of 1993 or 1996, which only served to bolster his misimpression. (*Id.*). Although Mr. Creamer did not think that check kiting was proper banking practice, he certainly never understood that his actions would lead to a federal criminal prosecution, particularly considering the fact that he always intended to repay every cent of floated money. (*Id.*). In fact, there is anecdotal evidence that check kiting which does not result in any loss to any bank is often not pursued as a criminal matter. For instance, Alfredo Saucedo, former head of the processing department at Broadway National Bank in San Antonio and a bank employee of nearly thirty years, notes in his letter to the Court:

> [I]t is clear that [Mr. Creamer] was not trying to gain financially from his activities, and that the banks involved did not lose any money. This is not

> the sort of case that I would have referred to my bank's legal department or reported to the authorities…. Criminal prosecution would be reserved only for cases of real fraud, not for the cases of individual customers or small businessmen essentially hoping to game the system to get past their temporary cash-flow problems.

(Alfredo Saucedo Letter at 2-3). *See also* Lowell Sachnoff Letter at 2 ("[D]rawing checks on uncollected funds is not an isolated occurrence, especially among financially insecure small business and community organizations…. [I]solated instances of such conduct are seldom reported to the authorities."). While this certainly does not excuse Mr. Creamer's actions, it is nonetheless important to understand that Mr. Creamer did not deliberately set out to engage in conduct that he knew to be criminal, and he gravely misunderstood the impact his actions would have on his career and his family.

Mr. Creamer similarly failed to recognize the inherent criminality of failing to pay Public Action's withholding taxes in a timely manner. Each quarter, Mr. Creamer fully and accurately reported his tax liability to the IRS. He never concealed that he owed these taxes, and he expected to pay them in due course. Bob Creamer fully understood that he was individually responsible for these taxes as a "Personally Responsible Party" under the tax laws. In fact, Mr. Creamer paid over $13,000 of his accumulated tax liability in 1998, and paid the remaining $42,000 in 2002. (Ex. 19 to Def. Memo; Ex. 20 to Def. Memo). Moreover, failure to pay withholding tax is a crime that – even according to the Sentencing Guidelines – is "infrequently prosecuted." U.S.S.G. §2T1.6, Comment., Background. In 2003, for example, the IRS was aware of 3,657,521 separate acts of failure to pay employment taxes, yet the IRS initiated virtually no criminal prosecutions for this conduct. (Ex. D to Defendant's Pretrial Motions, Internal Revenue Service 2003 Data Book, p. 34 Table 27). The Criminal Investigation unit of the IRS does not deem the number of prosecutions under 18 U.S.C. § 7202 significant enough to

even merit mention in its Annual Business Report. (Ex. E to Defendant's Pretrial Motions, Internal Revenue Service Criminal Investigation Annual Business Report, Fiscal Year 2003, p. 23 (pooling Section 7202 prosecutions in the catchall category of "Title 26 – Other," of which there were only 28 indictments nationwide in 2003). Therefore, it is important to understand that while Bob Creamer wrongly paid his taxes in a substantially delayed manner, he never intended to cheat or defraud the IRS and he never intended to permanently deprive the U.S. Treasury of his share of tax dollars.

Accordingly, Mr. Creamer's offense conduct is certainly not a reflection of the manner in which he managed Public Action's advocacy programs. Indeed, among his generation of peers, some of whom "were not interested in social change through peaceful civic involvement," Mr. Creamer always sought to effect social and economic justice from within the legal system. (Don Wiener, PhD. Letter at 1) Rather than take an approach utilizing "any means necessary," Mr. Creamer showed a generation of organizers "that real victories could be won for society's poor through social and political action within the rules laid down by the U.S. Constitution." (*Id.*).

Perhaps most telling is Mr. Creamer's response to the investigation and indictment in the present case. Following the initiation of the investigation almost nine years ago, Mr. Creamer recognized his grave errors in judgment and sought to educate others about the difficult lessons he has learned. For example, Mr. Creamer advised his daughter, Lauren, to learn from his mistakes and to set realistic budgeting goals as she sets out to build her own non-profit organization. (Lauren Creamer McLauglin Letter at 1). More significantly, Mr. Creamer also shared his personal experiences with the young organizers and political activists whom he mentors:

> I have watched my father sit with groups of young people who all want to be involved in the political process. He speaks frankly with them about

> the need to strike a balance between a vision and the means by which it is achieved. He humbly talks about his mistakes and warns others not to let their dreams or organizational needs get ahead of their financial capacity.

(*Id.* at 3). In managing SCG's consulting business for the past seven years, moreover, Mr. Creamer did not repeat his earlier mistakes: he has never missed a payment of federal tax withholding and has never kited any checks. There can be no question that Mr. Creamer has internalized the difficult lessons learned from his conduct, and that he will never again engage in actions that risk repeating the personal shame, professional damage, and family hardship that have resulted from his offense conduct.

## IV.    SENTENCING RECOMMENDATION

### A.    Summary of Guideline Calculations

The pertinent facts concerning Mr. Creamer's offense conduct are not in dispute. Moreover, the application of the sentencing guidelines to these facts is generally agreed, with the notable exception of the calculation of "actual loss" for the 1997 check kite. The parties agree that the November 1, 1997 version of the Sentencing Guidelines applies to this case.

The accurate Sentencing Guideline calculations are as follows:

**Bank Fraud – §2F1.1**
- Base Offense                                     6
- More Than Minimal Planning              +2
- "Loss" in 1993 ($603,000)[5]              +10
- No Loss in 1996 & 1997 ($0)                0

---

[5] While we acknowledge, for Guideline purposes, that there was an "actual loss" in 1993 within the meaning of §2F1.1, it is important to recognize that no bank suffered a literal actual loss. Every bank was made whole within a few months of detecting the float. Moreover, at the time of the check kite, Public Action possessed over $800,000 in collectible receivables – more than enough to completely cure the float. Therefore, while for Guideline purposes we agree that a loss of figure of $603,000 is appropriate, we respectfully submit that downward departures from this loss figure are appropriate for a number of reasons, including: 1) the loss figure overstates the seriousness of the offense; 2) the loss figure ignores the economic reality of the kite; 3) the offense occurred more than twelve years ago; 4) Mr. Creamer's extraordinary acceptance of responsibility; and 5) Mr. Creamer's post-offense rehabilitation.

| | | |
|---|---|---|
| • Organizer or Leader | +2 | |
| TOTAL | 20 | |

**Tax Fraud – §2T4.1**

| | | |
|---|---|---|
| • Tax Loss ($50,006) | 13 | |

| | |
|---|---|
| Grouping (7-level difference) | +1 |
| Acceptance of Responsibility | -3 |
| **Total Adjusted Offense Level** | **18** |
| **Subtract Downward Departures** | **To Be Determined By The Court** |
| **Final Recommended Offense Level** | **10 or Less** |

The Guideline calculations set forth above – before application of downward departures – result in a total adjusted offense level of 18.[6]  Mr. Creamer has no relevant criminal history, so he is in Criminal History Category I.  Accordingly, the Sentencing Guidelines suggest an initial sentencing range of 27-33 months imprisonment.  However, due to the unique mitigating facts presented by this case, there are multiple bases for substantial downward departures from this guideline range.

There is no question that Mr. Creamer stands apart from the "heartland" of defendants charged with bank fraud and tax evasion.  Rare indeed is the criminal defendant who acts not to benefit himself, his family, or even his friends, but rather to sustain an organization whose sole mission is to improve the lives of average citizens and to advocate on behalf of consumers, the poor, and the elderly.  Mr. Creamer never intended to cause any harm, and he worked diligently to repay the debts that were occasioned by his conduct.  Moreover, he willingly cooperated to prevent any financial loss and to provide swift repayment nearly a decade before he faced

---

[6] The Presentence Investigation Report ("PSR") suggests a total offense level of 19 prior to the application of downward departures.  (PSR at 11).  This level would result in an advisory Guideline sentencing range of 30-37 months.

criminal prosecution. Considering these exceptional circumstances, numerous downward departures are not only appropriate, they are essential in order to reach a just and equitable advisory sentencing range.

### B. Calculation of "Actual Loss" for the 1997 Check Kite

The probation department suggests that the "actual loss" under the guidelines for the 1997 check kite is $1.4 million, which was the total amount of the float on May 28, 1997. Mr. Creamer respectfully objects to this finding of the PSR. Under the applicable legal standard, the proper calculation of loss under the guidelines must consider the offsetting deposits available on June 3, 1997 – not May 28, 1997 – that were more than sufficient to cover the entire amount of the overdraft. As discussed below, when these offsets are properly accounted for, the actual loss of the 1997 check kite is zero.

#### 1. Legal Standard

§2F1.1 of the Sentencing Guidelines governs the calculation of "loss" resulting from bank fraud in violation of 18 U.S.C. §1344. The guidelines provide that the greater of "intended loss" or "actual loss" must be applied to determine the appropriate offense level. U.S.S.G. §2F1.1, App. Note 7. In the present case, Mr. Creamer did not intend to cause any loss, and the government acknowledges that "intended loss" is not a relevant consideration. (Supplement to Govt. Version at 7). Therefore, Mr. Creamer's offense level will be determined by the amount of "actual loss."

The guidelines do not precisely define how actual loss should be calculated for check kiting. Therefore, the district court has substantial discretion in determining loss as long as the calculation is "reasonable." U.S.S.G. § 2B1.1, App. Note. ("Loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available

information.").  In the Seventh Circuit, the guiding principle for calculation of loss is that courts must consider the "economic reality" of the offense.  *United States v. Schneider*, 930 F.2d 555, 559 (7th Cir.1991) (vacating sentence where "the estimate of the loss bore no relation to economic reality").  For example, the total amount of deposits in a check kite is not an appropriate measure of actual loss because these deposits are constantly circulated among the bank accounts to maintain the float and are never actually at risk.  FEDERAL SENTENCING GUIDELINES HANDBOOK, Haines, R. *et al.*, p. 704 (2004 edition) ("The loss in a check kite is not … the sum of all the bad checks written by the defendant because both the deposits and withdrawals are largely fictitious"); *United States v. Kipta*, 212 F.3d 1049, 1051 (7th Cir. 2000) ("the total amount of deposits is never at risk due to the necessity of maintaining the float").

In order to determine actual loss in a manner consistent with economic reality, one must calculate the "net overdraft" of the check kite.  "The general rule in check kiting cases is that the loss is the amount of the overdraft in the affected accounts at the time of the detection of the kite, less certain immediately available offsets."  FEDERAL SENTENCING GUIDELINES HANDBOOK at 704.  The offsets that must be taken into account to determine the net overdraft are: (1) the legitimate funds available at the banks involved in the kite; and (2) money that the defendant immediately applies against the overdraft.  *United States v. Shaffer*, 35 F.3d 110, 114 (3rd Cir. 1994); *United States v. Carman*, 25 F.3d 1050, *2 (6th Cir. 1994) (unpublished opinion) ("Appellant argues that the loss upon which the sentence is based must reflect economic reality. Thus, actual loss is equivalent to net loss, or the amount of outstanding kited checks minus legitimate deposits.  We agree.").  The Third Circuit elaborated this calculation in *United States v. Shaffer*:

> [T]he gross amount of the kite at the time of detection, less any other collected funds the defendant has on deposit with the bank at that time and

31

> any other offsets that the bank can immediately apply against the overdraft (including immediate repayments), is the loss to the victim bank.

35 F.3d at 114. *See also Id.* at 115 ("the actual loss should be reduced by the amount of money immediately repaid by the offender at the time of discovery").

The net overdraft of a check kite is determined at the "time of detection," which includes the period during which the float comes to an end and all checks are presented for deposit at a bank. FEDERAL SENTENCING GUIDELINES HANDBOOK at 704 ("loss in a check kite is only determined after all the fraudulent checks have been presented for payment"). Thus, the period of discovery of a check kite is not limited to the moment when the scheme is first detected, but encompasses the time when the fraudulent checks are presented for payment. *United States v. Akbani*, 151 F.3d 774, 777 (8th Cir. 1998).

### 2. The Actual Loss for 1997 Is Zero

As previously explained, Mr. Creamer resorted to check kiting in 1997 in order to overcome a cash-flow shortfall caused primarily by two related programs at Public Action: first, the "delay program," whereby credit card payments that had been authorized by members of Public Action were not processed for a period of up to thirty days; and, second, Public Action's funding of a "reserve account" at U.S. Bank of Oregon. Indeed, these two programs created an enormous pool of available funds for Public Action that must be taken into account in determining the amount of actual loss for purposes of the Guidelines.

The delay program built a massive reservoir of authorized credit card payments which first led to the creation of the float in 1997, and which were immediately processed to offset and cure the float when it was detected in late May 1997. As of May 28, 1997, Public Action had in its possession approximately $1.6 million in authorized credit card sales merely awaiting deposit. (Ex. 10 to Def. Memo, Merchant Account Statements; Credit Card Protection Program

Electronic Database (previously provided to the government)). Similarly, the reserve account at U.S. Bank of Oregon, which was being funded at a rate of $25,000 per week, totaled approximately $740,000.00 by the end of May, 1997. (Ex. 8 to Def. Memo, U.S. Bank Letters; Ex. 9 to Def. Memo, U.S. Bank Statements).

Significantly for purposes of determining actual loss, the reservoir of credit card authorizations was an integral part of the float itself. In 1997, the float circulated between three separate banks: Cole Taylor, South Shore, and U.S. Bank. Two of Public Action's accounts at U.S. Bank were involved in the float: (1) the credit card processing account used by Public Action to charge credit cards; and (2) a standard checking account. When credit card charges were processed at the end of each delay period, the funds automatically flowed from the credit card processing account directly into Public Action's standard checking account at U.S. Bank. These legitimate funds from the U.S. Bank checking account were then transferred to South Shore Bank and ultimately to Cole Taylor, in conjunction with the same circuit of kited checks used to maximize the float. Public Action also maintained a second credit card processing account at Fleet Bank. The Fleet Bank account was established with specific instructions that all credit card charges processed in that account were to be automatically and exclusively deposited into South Shore's CACCR checking account. (Ex. 11 to Def. Memo, Fleet Merchant Account Application). Therefore, the credit card sales processed at Fleet Bank represented additional legitimate funds that also flowed directly into South Shore Bank in connection with the float. (Ex. 12 to Def. Memo, Diagram of Check Kite).

Thus, during the period of the 1997 check kite, legitimate funds from credit card sales were deposited into the affected accounts on a daily basis. In fact, from May 1 through May 27, 1997, the organization deposited more than $1.5 million in credit card sales into the accounts

involved in the check kite.  (Ex. 10 to Def. Memo, Merchant Account Statements).  At any given time, the account balances included a substantial portion of legitimate funds generated by the credit card membership program.  Thus, the credit card sales, both deposited and awaiting deposit, were an integral part of the flow of funds involved in the check kite.

It is clear that, as of late May, 1997, the credit card sales awaiting deposit were more than sufficient to cover any potential overdraft created by the check kite.  The parties agree that on May 28, 1997, when Cole Taylor Bank notified Mr. Creamer that it would no longer pay out on checks that were not supported by collected funds, the total amount of the float equaled $1.4 million.[7]  (PSR at 8, ll. 256-57).  However, as noted above, Public Action possessed over $1.6 million in delayed credit card sales merely awaiting deposit on May 28, 1997, in addition to a reserve account of over $700,000.

Due to the immediate processing of credit card sales in the delay program, a net overdraft *never* developed in 1997.  After Mr. Creamer directed the staff at Public Action to capture a substantial portion of the authorized credit card sales that had been awaiting deposit, sufficient funds were deposited into Public Action's accounts to cure the entire float – before all of the kited checks had even been presented for deposit at the various banks.  In fact, the majority of the floated checks were not presented for deposit until June 3, 1997.  (Ex. 13 to Def. Memo, Cole Taylor Bank Statement, June 1997 (showing 17 floated checks presented for deposit on June 3, 1997)).  By the time these floated checks were presented for deposit, Public Action had already

---

[7] The PSR mistakenly states that the "the parties agree that the *net loss* related to the 1997 check-kite is $1.4 million."  (PSR at 8) (emphasis added).  This is not quite accurate.  In fact, the parties agree that, as of May 28, 1997, the total amount of kited checks that were unsupported by sufficient funds totaled $1.4 million.  The parties *disagree as to the net loss* of the 1997 check-kite.  As set forth herein, the defendant asserts that there was no net loss in 1997 due to the funds that Public Action possessed in the delay program and reserve account, which funds immediately cured the float before all kited checks were presented for payment.

deposited over $1.5 million into its bank accounts from the delay program. (Ex. 10 to Def. Memo, Merchant Account Statements). Because June 3, 1997 is the operative date of discovery, *see United States v. Akbani*, 151 F.3d at 777, no net overdraft developed. Thus, there is no actual loss.

In order to eliminate the float, Mr. Creamer and Public Action did not need to use one cent of the $740,000 in the U.S. Bank reserve account. In fact, Public Action had a massive amount of cash remaining after the float was eliminated. As of June 11, 2005 – after the float was completely resolved – Public Action had positive balances of approximately $100,000 in its U.S. Bank accounts, $740,000 in its U.S. Bank reserve accounts, $80,000 in its South Shore accounts, and over $250,000 dollars in its credit card merchant accounts. (Ex. 9 to Def. Memo, U.S. Bank Statements; Ex. 8 to Def. Memo, U.S. Bank Letters; Ex. 14 to Def. Memo, South Shore IPAF & CACCR Bank Statements; Ex. 10 to Def. Memo, Merchant Account Statements). This total of approximately $1.2 million was assigned to Access Capital, which took over the Credit Card Protection program in the aftermath of the negative publicity that Public Action and Mr. Creamer suffered upon the detection of the check kiting activities.

In light of these facts, applying an "actual loss" amount of $1.4 million (as the PSR suggests) is simply untenable. This conclusion is improper because it fails to take into account the credit card sales that were integral to the flow of funds in the check kite and used to completely eliminate the float. As we have previously established, Public Action's "reservoir" of uncharged credit card payments undoubtedly contained sufficient money to offset and cure the entire amount of the float, and this money was immediately applied to eliminate the float before the legally determined date of discovery. In sum, a loss amount of $1.4 million would inflate Mr. Creamer's guideline calculations in a manner that is incommensurate with actual risk to the

banks and the economic reality of this unique check kite. Accordingly, the amount of "actual loss" in connection with the 1997 check is, and must be, zero.[8]

## C.  Motions for Downward Departure

### 1.  The Loss Amount Overstates the Seriousness of the Offense

A downward departure is appropriate when the amount of loss calculated under the guidelines significantly overstates the seriousness of the offense. §2F1.1, App. Note 7(b) ("Where the loss determined … significantly … overstates the seriousness of the defendant's conduct, [a] … downward departure may be warranted."); App. Note 10 ("In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense."). Because this basis for departure is acknowledged by the guidelines, it is considered an "encouraged basis for departure." *United States v. Koon*, 518 U.S. 81 (1996); *United States v. Forchette*, 220 F.Supp.2d 914, 924 (E.D. Wis. 2002).

### a.  1993 Loss Overstates the Seriousness of the Offense

In the present case, the guideline loss amount for the 1993 check kite ($603,916.81) significantly overstates the seriousness of Mr. Creamer's criminal conduct. Although Mr. Creamer undoubtedly engaged in this check kite, he never intended to steal any money and he always intended to make good on his obligations. Mr. Creamer's intent to repay was supported by over $800,000 in Public Action receivables, thereby essentially eliminating any real risk of loss to the banks. (Ex. 1 to Def. Memo, Summary of Public Action Receivables, December

---

[8] Although the facts are clear that no net overdraft occurred, it is also important to note that Cole Taylor Bank would never have incurred any overdraft if Public Action possessed software (which was subsequently obtained by Public Action's successor) that automatically deposited credit card charges from a database, without the need for manual entry. (Ex. 15 to Def. Memo, Instructions for Automatic Capture). If Public Action had the automatic software – instead of relying on manual processing of thousands of credit cards – Public Action would have captured sufficient funds from the delay program on May 28th (the day Cole Taylor stopped paying out on uncollected funds), and no temporary overdraft would ever have occurred at Cole Taylor.

1993, With Supporting Materials). Moreover, after the overdraft developed, Mr. Creamer worked diligently to repay the banks as quickly as he could, and he succeeded in repaying every bank in less than three months – without any hint of a criminal investigation and nearly ten years before he was actually indicted.

A defendant's atypical, benign intent supports a finding that the loss overstates the seriousness of the offense. In *United States v. Forchette*, the District Court surveyed cases involving downward departures and found that a defendant who committed fraud with the intention of paying back the money is eligible for a downward departure:

> [T]he unusual nature of the fraudulent conduct or of the defendant's role in it may provide a basis for a departure. For example… *his intent in involving himself in the scheme may have been significantly different than the usual fraud defendant, e.g. he may have entered the scheme with honest intentions or with the intent to make good on his obligations.*

220 F.Supp.2d 914, 925 (E.D. Wis. 2002) (emphasis added). Indeed, a number of courts have awarded downward departures based upon the defendant's unusually benign intent. *See, e.g., United States v. Brennick*, 134 F.3d 10, 14 (1st Cir. 1998) (upholding downward departure because the defendant always intended to pay money that was improperly withheld from the IRS); *United States v. Broderson*, 67 F.3d 452, 459 (2nd Cir. 1995) (upholding downward departure for defendant whose "criminal intent was significantly different from that of the typical fraud defendant" because defendant did not set out to mislead and the victim of the fraud ultimately suffered no loss); *United States v. Monaco*, 23 F.3d 793, 799 (3rd Cir. 1994) (finding that a downward departure was permissible in fraud case because defendant's intent "was not to steal money outright, … but to expedite payments that would have been due at some future time and obtain a *de facto* interest-free loan.").

In the present case, even the government agrees that Mr. Creamer intended to obtain a *de facto* interest-free loan. (Govt. Version at 11) ("Creamer knowingly induced the aforementioned banks to extend nonauthorized, unsecured short term loans"). The government, moreover, does not dispute that Mr. Creamer at all times intended to repay – and did repay – this "loan" in full. Mr. Creamer never intended to permanently deprive the banks of any money, nor did he seek to enrich himself or others. Mr. Creamer's sole purpose for engaging in the check kites was to provide temporary support for the public interest, non-profit activities of Public Action. Considering these circumstances, it would be wholly inequitable to punish Mr. Creamer using the same loss calculations that would apply to a defendant who committed fraud to enrich himself and who never intended to repay the stolen money. *United v. Schneider*, 930 F.2d 555, 559 (7th Cir.1991) (holding it is "irrational" to punish a defendant who actually intends to perform his responsibilities as severely as a con-man who steals outright).

### b. 1997 Loss Overstates the Seriousness of the Offense

The bases for downward departure that apply to the 1993 kite are even more applicable to the 1997 kite. As discussed at length above, in 1997 Public Action possessed credit card sales that were more than sufficient to cover the float, and which in fact did cure the float within a matter of a few days. In 1997, therefore, the risk to the banks was zero, as borne out by the immediate curing of the float. Moreover, as in 1993, Mr. Creamer acted with benign intent in 1997: he did not intend to cause any loss, nor did he intend to enrich himself in any way. Accordingly, even if the $1.4 million calculation of loss in 1997 is accepted – a conclusion that is not supported by the facts of this case – then a substantial downward departure is essential to fair and reasonable sentence.

###### 2. **Economic Reality: The Risk to the Banks Was Minimal Because Public Action Possessed Sufficient Receivables to Cover the Float**

A downward departure should be awarded when the amount of loss under the sentencing guidelines is disproportionate to the actual risks created by the defendant's conduct. *United States v. Downs*, 123 F.3d 637, 644 (7th Cir. 1997) ("fraud sentences should be grounded in economic reality and based on the actual risks created by defendants, [and] the place for such considerations … is a district court's departure decision") (*citing United States v. Schneider*, 930 F.2d 555, 558-59 (7th Cir.1991)); *United States v. Lane*, 194 F.Supp.2d 758, 775 (N.D. Ill. 2002). In *Lane*, Judge Norgle determined that the actual loss overstated the seriousness of the offense because it did not take into account the "economic realities" of the case, specifically that the victims had been repaid much of their losses through certain guarantees. *Id.* Judge Norgle concluded "that a loss figure representing the seriousness of Lane's crimes and its economic impact on the victims would be had by examining the victim's out of pocket losses" and granted a downward departure. *Id.* The Seventh Circuit approved this downward departure. *United States v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) ("Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime and the time to take economic realities into account 'is [at] a district court's downward departure decision.'").

Moreover, when a defendant possesses significant assets to cover a fraudulently obtained loan, a downward departure is appropriate to more accurately measure the actual risk to the bank. *United States v. Oligmueller*, 198 F.3d 669, 671-72 (8th Cir. 1999) ("In this case, the loss figure of $829,000 significantly overstates the risk to the bank. [Defendant] had sufficient unpledged assets to support the loan amount and to pay the bank most of the amount it was owed, as shown

by the fact he has paid the bank $836,000. Accordingly, we find that a downward departure is warranted in this case to a level that corresponds to a loss figure of $58,000.").

Mr. Creamer's conduct in 1993 did not create an actual risk that the banks would lose over $600,000. In fact, Mr. Creamer knew that Public Action possessed over $800,000 in receivables at the time that he implemented the check kite – an amount more than sufficient to protect every bank involved. (Ex. 1 to Def. Memo, Summary of Public Action Receivables, December 1993, With Supporting Materials). More importantly, Mr. Creamer diligently applied these receivables to cover the overdrafts that developed. For example, Mr. Creamer cured the largest 1993 overdraft, which occurred at HomeBanc on December 22, 1993, in the amount of $587,000, within nine days. (Ex. 4 to Def. Memo, HomeBanc Statements). Indeed, as of December 31, 1993, only two banks (Devon Bank and Mid-America National Bank) continued to show an overdraft, and the total overdraft had already dropped from $603,000 to less than $480,000. (Ex. 3 to Def. Memo, Mid-America National Bank Statements; Ex. 2 to Def. Memo, Devon Bank Statements). Mr. Creamer consistently and completely repaid this remaining overdraft over the next two-and-a-half months, further demonstrating that the actual risk to the banks never came close to approaching the $600,000 amount of "loss." Accordingly, the economic realities of the 1993 check kiting conduct provide yet another basis for a downward departure.

With respect to the 1997 check kite, the evidence in support of a downward departure is even more compelling. It is undisputed that Public Action possessed over $1.6 million in credit card sales to cover any potential overdraft, in addition to a reserve account in excess of $700,000. The float created by the check kite, on the other hand, did not exceed $1.4 million.

40

Therefore, there was never a risk to the banks, who were completely covered within a matter of days from this massive reservoir of cash. A downward departure is appropriate.

### 3. Disproportion of Loss Calculation to Mr. Creamer's (Nonexistent) Gain

A significant disparity between the loss calculation and the defendant's gain also justifies a downward departure. *See Forchette*, 220 F.Supp.2d at 925 (E.D. Wis. 2002) (downward departure may be appropriate where "the defendant's fraud may have been for little or no gain, especially in comparison to the size of the loss"); *United States v. Costello*, 16 F.Supp.2d 36, 39 (D. Mass. 1998) (granting departure based on the extent of disproportion between the loss amount and the gain to the defendant in a theft case, finding that "[t]he 'heartland' … resides in a case where loss and gain are roughly coincident").

In the present case, Mr. Creamer did not personally gain from his offense conduct. To the contrary, the actions he undertook in order to keep Public Action above water have caused Mr. Creamer severe public humiliation, financial debt, years of anguish, uncertainty and stress due to the prolonged investigation, and the termination of his twenty-three year career at the public interest organization that he founded and built from the ground up. Indeed, Mr. Creamer's friends and associates have witnessed the "great pain and humiliation" that he has endured due to his serious errors in judgment. (Robert Brandon Letter at 1). As Walter Kendall notes, Bob Creamer's mistakes have "weighed heavily on Bob every day over the last eight years," and there is no question that this "ordeal has taken a toll on Bob's personal and professional life. Bob recognizes that his acts have hurt family, friends, and allies. All of this has caused him personal pain and professional loss." (Walter Kendall Letter at 1). In light of these circumstances – and in light of the total absence of personal gain – a further downward departure is appropriate.

### 4. **Extraordinary Acceptance of Responsibility**

The Seventh Circuit acknowledges that extraordinary acceptance of responsibility may justify a departure under § 5K2.0.[9]  *United States v. Bean*, 18 F.3d 1367, 1369 (7th Cir. 1994) ("[u]ndoubtedly there are circumstances that would justify using §5K2.0 to go beyond two levels" for acceptance of responsibility); *United States v. Carey*, 895 F.2d 318, 323-324 (7th Cir. 1990) ("Under §5K2.0, the Guidelines allow a court to increase the two-level reduction given the defendant for his acceptance of responsibility if the court determines that 'unusual circumstances' exist and the circumstance is 'present to a degree substantially in excess of that which is ordinarily involved.'").  Moreover, in *United States v. Oligmueller*, the Eighth Circuit held that the defendant was entitled to a departure based on extraordinary restitution because the defendant voluntarily began making restitution more than a year before he was indicted, worked to maximize the value of his forfeited assets, and ultimately paid back 94% of the money he owed to the bank.  198 F.3d 669 at 672.

Mr. Creamer's acceptance of responsibility has been truly extraordinary.  In each instance of check kiting, Mr. Creamer repaid every cent to every bank and he did so long before – indeed, between seven and eleven years before – he was indicted.  In 1993, the only occasion in which Public Action lacked sufficient funds to immediately cover the float, Mr. Creamer marshaled the resources to repay the banks in less than 90 days.  In 1996, Mr. Creamer repaid the banks before they even discovered that a check kite existed.  *United States v. Bean*, 18 F.3d at 1369 (7th Cir.)

---

[9] U.S.S.G. § 5K2.0 permits departures for:

> a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines…. Where … the applicable offense guideline and adjustments do take into consideration a factor, … departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which is ordinarily involved in the offense.

(noting that downward departure may be appropriate where the defendant repays the entire amount before it is discovered). Similarly, in 1997, Mr. Creamer applied Public Action's available credit card sales to prevent a net overdraft from occurring. In fact, in every instance, Mr. Creamer acted more swiftly to repay the banks than did the defendant in *Oligmueller*, who received a downward departure of 6 levels even though it took him over a year to repay 94 percent of the overdraft.

In addition to his extraordinary restitutionary efforts, Mr. Creamer also immediately acknowledged his conduct and worked with each bank to resolve the check kites in the most efficient manner possible. When the floats were discovered in 1993 and 1997, for example, Mr. Creamer unhesitatingly met with the banks and cooperated with them in order to prevent an overdraft from occurring and to resolve any overdraft that did result. Moreover, in 1997, Mr. Creamer resigned his position at Public Action – a position that he had held for over two decades – mere days after the discovery of the kite. There can be no question that Mr. Creamer's immediate and extraordinary acceptance of responsibility justifies a multi-level downward departure in this case.

## 5. Lesser Harms

Probation Officer Sheila Lally has identified U.S.S.G. §5K2.11, the lesser harms provision, as an additional basis that may warrant a downward departure in this case. (PSR at 24). When a defendant commits a crime "to avoid a perceived greater harm, … [and] the circumstances significantly diminish society's interest in punishing the conduct," then a reduced sentence is appropriate. U.S.S.G. §5K2.11.

Mr. Creamer committed his offenses in order to avoid perceived greater harms. With respect to his check kiting activities, Mr. Creamer was at all times motivated by his desire to

preserve the operations of Public Action, a non-profit, public-interest organization that has had a tremendous beneficial impact on thousands of ordinary citizens. Mr. Creamer similarly failed to pay over his tax withholding in order that he could repay Suzette Harris, an individual who would have been financially devastated by Public Action's inability to repay her loan. Consequently, society's interest in punishing Bob Creamer's conduct is certainly tempered by Mr. Creamer's selfless motivations.

## 6. Mr. Creamer Did Not Intend to Evade Taxes or to Permanently Deprive the IRS

A defendant who does not intend to permanently deprive the IRS of funds is eligible for a downward departure. *United States v. Brennick*, 134 F.3d 10, 14 (1st Cir. 1998) ("a temporary delay in payment – where the defendant expected to pay – is not a 'typical' or 'heartland' case of tax evasion"). In *Brennick*, the defendant was convicted of failing to pay over federal withholding taxes in violation of 26 U.S.C. § 7202 – the same statute to which Mr. Creamer has pled guilty. The district court found that the defendant, "although he had deliberately failed to pay the government the withheld wage and social security taxes at the time they were due, genuinely intended to pay them in due course," and accordingly granted the defendant a downward departure. *Id.*

Mr. Creamer clearly did not intend to evade his tax obligations. Every quarter of every year, Mr. Creamer accurately reported the amount of IDI tax withholdings owed to the IRS. (Ex. 18 to Def. Memo, IDI Forms 941). Moreover, Mr. Creamer did ultimately pay these taxes in due course. (Ex. 19 to Def. Memo, Tax Payment Checks; Ex. 20 to Def. Memo, Letter from IRS & Checks). Considering that Mr. Creamer always accurately reported his tax obligations and ultimately paid these obligations, it would be inequitable to punish Mr. Creamer using the same loss calculation that would apply to someone who deliberately concealed income and lied to the

44

IRS.  An additional downward departure is warranted.

### 7.  Pre-Indictment Delay

The government was aware of every instance of check kiting by May 30, 1997, and yet the government chose to wait almost seven years before indicting Mr. Creamer in March 2004. Worse, the government was fully aware of the 1993 check kite for more than ten years before the date of indictment.  This inexcusable and unconscionable delay has never been adequately explained by the government.  Indeed, this Court has noted the government's "inability to explain th[e] delay" and described the government's supposed explanation as "conclusory, vague and speculative."  Memorandum Opinion & Order, April 8, 2005, pp. 10-11.

In light of this inordinate passage of time and unjustified delay, a downward departure is plainly appropriate.   During the intervening years, while the government inexplicably procrastinated, Mr. Creamer rehabilitated himself and his career.  Mr. Creamer helped to establish two new companies – Issue Dynamics and Strategic Consulting Group – to support his family, repay his debts, and continue his mission of progressive advocacy.  Notably, during the past five years, and for the entire time that Mr. Creamer has led Strategic Consulting Group, he has not missed a single tax payment – demonstrating beyond any doubt that Mr. Creamer has learned from his errors and will not repeat the mistakes of the past.  Moreover, Mr. Creamer has been an extraordinarily productive member of his community: one of the companies that Mr. Creamer founded – Strategic Consulting Group – provides employment to five full time employees, and numerous part-time organizers.  Most importantly, Mr. Creamer has continued to work to create a better world, fighting on behalf of society's voiceless and underserved.  Indeed, "even with an investigation hanging over his head, Bob continued to be one of the most brilliant and productive leaders of the progressive movement for social and economic justice."  (Jan

Schakowsky Letter at 2).

Imprisoning Mr. Creamer today, in 2006, for conduct that occurred up to twelve years ago would ignore both the government's unjustifiable procrastination and Mr. Creamer's remarkable rehabilitation. Delay in prosecution of a case, whether alone or in combination with post-offense rehabilitation, warrants a downward departure. *United States v. Neuendank*, 2004 WL 419915 (N.D. Ill. 2004). As the Court noted in *Neuendank*,

> [T]he delay effectively removed any deterrent effect prosecution might have on Neuendank or others, allowed to pass any need that might have existed to protect the public or individuals, and eliminated any need for further rehabilitation -- all of which are among the important goals of sentencing as declared by Congress. *See* 18 U.S.C. § 3553(a)(2).
>
> ***
>
> [D]elay also impaired the goal of retribution, that is, the idea that punishment should reflect the seriousness of the offense and promote respect for the law. *See id.* Imposition of punishment within the Guideline-prescribed range after Neuendank had made significant restitutionary efforts and agreed to make full restitution, rehabilitated himself, and shown that he did not pose a significant risk of future criminal activity, would effectively turn our justice system into an indiscriminate avenging angel, mowing down offenders irrespective of whether doing so will contribute to Congress' declared sentencing goals.
>
> ***
>
> [A] sentence within the Guideline range would [also] effectively deprive both society and Neuendank of the benefits of his rehabilitative efforts over the six years that have passed since his offense was discovered.

*Id.* at 2-3. As in the *Neuendank* case, Mr. Creamer has made full restitution, rehabilitated himself, shown that he does not pose any risk of future criminal activity, and worked to improve society through his labors. Mr. Creamer's sentence should reflect these exceptional circumstances, as well as the extraordinary delay caused solely by the government.

**D.  Sentencing Considerations in Light of _United States v. Booker_**

In addition to the numerous bases for downward departure under the Sentencing Guidelines, there are several additional factors under 18 U.S.C. § 3553 that support a sentence that does not include any incarceration.   Indeed, _United States v. Booker_, 125 S.Ct. 738 (2005), now makes clear that a mechanical application of Guidelines calculations is not the appropriate means to determine a federal criminal sentence.  Rather, the Guidelines serve an advisory role in the exercise of judicial discretion.

In _Booker_, the Supreme Court held that district courts are to consider other directives as set forth in 18 U.S.C. § 3553(a).  "Thus, under _Booker_, courts must treat the guidelines as just one of a number of sentencing factors."  _United States v. Ranum_, 353 F.Supp.2d 984, 985 (E.D. Wis. 2005).   Section 3553(a) catalogs the additional sentencing factors to be considered, including the nature and circumstances of the offense and the history and characteristics of the defendant, which Congress expressly designed to achieve a "sentence sufficient, but not greater than necessary."  18 U.S.C. § 3553(a).  By dispensing with the mandatory (and unconstitutional) application of Sentencing Guidelines, and by simultaneously encouraging district courts to also consider these additional statutory factors, the Supreme Court in _Booker_ made clear that even some factors that the Sentencing Guidelines had deemed impermissible or disfavored now ought to be considered.  In short, the days of rote application of the Sentencing Guidelines are gone and courts now are free to exercise their discretion, as aided by the guidelines, to impose a "sufficient" and reasonable sentence in light of all the facts and circumstances presented.

In the present case, there are numerous considerations – as set forth at length above – that make a sentence of supervised release, with any period of home confinement the Court deems appropriate, the only reasonable and just result.  Such a sentence would appropriately punish the

47

man who currently stands before this Court. Considering Mr. Creamer's extraordinary lifetime of public interest efforts, his genuine remorse for his conduct, and his post-offense rehabilitation, a sentence of incarceration would exact a measure of retribution against Mr. Creamer that is not warranted on the facts and circumstances of this case.

Indeed, a sentence of imprisonment can only serve to remove from society an individual who poses no threat of future criminal behavior and who devotes each day to improving the social and political health of his community and nation. In their letters to the Court, numerous friends and colleagues of Mr. Creamer suggest that society would be better served if Mr. Creamer is able to continue his work on behalf of greater social justice:

- I pray that you do not incarcerate Bob. Instead, please recommend that Bob fulfill his debt to society through community service, which could, for example, include organizing political empowerment seminars and creating mechanism[s] for political empowerment for working class people, young adults, immigrants, and others…. He can help. (Lionel Jean Baptiste Letter at 2);

- All the purposes of sentencing and true justice would be well served by a sentence that did not involve incarceration for an individual such as Bob, who has … dedicated himself largely to serving the public good. (Jack Cutrone Letter at 2);

- This case presents an opportunity for … Bob to use his talents to keep other over-extended not-for-profit executive directors and staff from making the same misguided mistakes…. The stress to succeed all too often overwhelms the managerial talents of many in community development work. Bob could help others to know the consequences of bad judgment." (Lawrence Suffredin Letter at 1-2);

- Bob has suffered enormously…. He has paid dearly for these acts already and, at this point in time, sending him to prison would serve no purpose. Bob has been humiliated. He has been punished in his professional career and by the pain he has caused his family, to say nothing of his wife's career. For someone who has helped so many and hurt no one but himself and his family, I can only plead that you show mercy. We will all be better off with Bob Creamer working for us than sitting behind bars at our expense. (Jacquelyn Kendall Letter at 2).

Moreover, because Mr. Creamer engaged in his offense conduct with selfless motivations, society's interest in retribution is substantially diminished, particularly considering the personal embarrassment, financial harm, and professional impairment that he has already suffered as a result of his actions.

Therefore, with the support of his friends and family, Mr. Creamer respectfully requests that the Court adopt his sentencing recommendation, and fashion a sentence consistent with 18 U.S.C. §3561 that imposes a term of supervised release with any period of home confinement and/or conditions of community service that the Court deems appropriate.

Respectfully Submitted,

/s/ Theodore T. Poulos
Attorney for Robert Creamer

Ann C. Tighe
Theodore T. Poulos
Tyson K. Harper
COTSIRILOS, TIGHE & STREICKER
33 North Dearborn Street - Suite 600
Chicago, IL 60602
(312) 263-0345